[No. B034210. Second Dist., Div. Four. Jan. 15, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
MARCO TULIO ORDONEZ, Defendant and Appellant.

COUNSEL

Jeffrey J. Stuetz, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Richard B. Iglehart, Chief Assistant Attorney General, Edward T. Fogel, Jr., Assistant Attorney General, William T. Harter and Andrew D. Amerson, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**EPSTEIN, J.**—In this case, we decide that the crime of kidnapping for ransom, extortion or reward (Pen. Code, § 209, subd. (a)) involves a substantial risk of death to the victim and therefore supports a conviction of

second degree murder on a felony-murder theory.[1] We also resolve numerous other issues concerning defendant's conviction of second degree murder and aggravated kidnapping. Defendant raises issues of instructional error regarding the elements of kidnapping, unanimity of the verdict, and the lesser included offense of felony false imprisonment. He also contends that the evidence was insufficient to support the conviction of aggravated kidnapping. He argues that the imposition of life imprisonment without possibility of parole for aggravated kidnapping was improper as a matter of law. He contends that we must remand for resentencing because the court erroneously believed the only sentence permitted was life imprisonment without the possibility of parole. Finally, he contends that the court erred in ordering concurrent sentences. We conclude that only the last point has merit. We therefore modify the abstract of judgment with respect to concurrent sentences, and affirm the judgment in all other respects.

### FACTUAL SUMMARY

In reviewing the record on appeal, we must regard all factual disputes in the evidence to have been resolved in favor of the judgment. (See *People* v. *Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255]; *Jackson* v. *Virginia* (1979) 443 U.S. 307, 318-319 [61 L.Ed.2d 560, 573-574, 99 S.Ct. 2781].) We present a general summary at this point, reserving a fuller discussion of particular facts for our treatment of the issues to which they pertain.

Defendant, Marco Tulio Ordonez, was employed as a mechanic in Florida by Dogoberto Rodriguez (referred to as "Dogo" in the record, and

---

[1] All code references are to the Penal Code unless otherwise indicated.

Until June 1990, section 189 provided: "All murder which is perpetrated by means of a destructive device or explosive, knowing use of ammunition designed primarily to penetrate metal or armor, poison, lying in wait, torture, or by any other kind of willful, deliberate, and premeditated killing, or which is committed in the perpetration of, or attempt to perpetrate, arson, rape, robbery, burglary, mayhem, or any act punishable under Section 288, is murder of the first degree; and all other kinds of murders are of the second degree." This statute was amended in 1990 by Proposition 115 to include kidnapping as an underlying felony for first degree felony murder.

At the time relevant here, section 209 provided in pertinent part: "(a) Any person who seizes, confines, inveigles, entices, decoys, abducts, conceals, kidnaps or carries away any individual by any means whatsoever with intent to hold or detain, or who holds or detains, such individual for ransom, reward or to commit extortion or to exact from another person any money or valuable thing, or any person who aids or abets any such act, is guilty of a felony and upon conviction thereof shall be punished by imprisonment in the state prison for life without possibility of parole in cases in which any person subjected to any such act suffers death or bodily harm, or is intentionally confined in a manner which exposes such person to a substantial likelihood of death, or shall be punished by imprisonment in the state prison for life with the possibility of parole in cases where no such person suffers death or bodily harm. (b) Any person who kidnaps or carries away any individual to commit robbery shall be punished by imprisonment in the state prison for life with possibility of parole."

hereafter in this opinion) in the summer of 1986. Defendant had known Dogo for three to eight years. In July 1986, Dogo sent defendant to California on a business trip regarding motors. Dogo, who had a cocaine distribution business in Los Angeles, told defendant to familiarize himself with the area. After defendant returned to Florida, Dogo again sent him to southern California, telling him to "keep an eye" on Mario Gomez (Gomez), who was apparently a member of Dogo's cocaine distribution network.

Following Dogo's orders, defendant rode a bicycle in the neighborhood where he knew Gomez's house was located. Defendant approached a group in Gomez's front yard and asked about a black Volkswagen which was in the driveway. Gomez's son Carlos Gomez befriended defendant and they often socialized together thereafter.

Dogo called defendant that fall and told him that Gomez had cocaine which belonged to Dogo. He directed defendant to either recover the cocaine or $150,000, the value of the missing drugs. Either Dogo or defendant hired Manuel Salais and "Cholin"[2] to assist in this task. Two attempts to obtain the drugs or money from Gomez were thwarted when defendant and his cohorts encountered too many family members present at the Gomez home. Defendant then spent three to four days in a hotel with Salais waiting for another opportunity to retrieve the drugs or money from Gomez.

On October 15, 1986, defendant, Salais, and Cholin met at an automobile detail shop, and traveled from there to the home of Gomez and Mrs. Gomez, purportedly to finalize the sale of the Volkswagen automobile to defendant. They drove there in a Ford Granada that defendant had purchased for Dogo, using a false name. Gomez let the three men into the house. Defendant was the last to enter. Mrs. Gomez was in the laundry area when Salais entered the room. He put a gun to her head while Cholin bound her hands and feet with duct tape. She was scared. Mrs. Gomez was laid on the floor of the family room next to her granddaughter's crib. Defendant did not look surprised when he saw one of his companions with a gun. Mrs. Gomez saw defendant and Salais lead her husband past her into a back bedroom which he used as an office. She was unable to see or hear what occurred in that room. During this time, however, she heard her husband say that he did not have either the drugs or the money being demanded of him. Cholin remained in the room with Mrs. Gomez, watching out the window.

Defendant and Salais returned Gomez to the family room, his hands and mouth taped. Defendant was carrying a bag containing cocaine found in the

---

[2] "Cholin's" true identity was never established. Therefore, we adopt the name used by defendant.

crawl space below the bedroom closet, together with money, jewelry and a black book removed from a safe which Gomez had opened for them. Defendant directed one of his companions to get the car and open the trunk. While on the floor next to his wife, Gomez asked "What will I do?" and mentioned the name "Dago."[3] Mrs. Gomez thought "Dago" was a friend of her husband. Three days before, Gomez had told her that he was holding money for "Dago."

Defendant directed one of the men to put Gomez in the trunk of the Ford in which defendant, Salais and Cholin had driven to the Gomez residence. Mrs. Gomez asked defendant not to put her husband in the car. Defendant told her that they would harm the family if she told the police. Defendant also told Mrs. Gomez that her husband might not be back. When she asked him if he was a policeman, he replied that he was from the Mafia. Defendant issued orders to Salais and Cholin while they were in the house.

Salais and Cholin put Gomez into the trunk of the Ford. Defendant made no effort to deter them from doing so. Defendant, Salais, and Cholin then drove to the automobile detail shop where the three had met before going to Gomez's home. They arrived at the shop between 11 in the morning and noon. Gomez was given water, and then taken to a house owned by a friend of Dogo. There Gomez was taken out of the car and given more water. Salais kept his gun on Gomez while Dogo talked to him about a shipment of cocaine. Defendant testified he was standing 10 to 12 feet away, smoking some of the crack cocaine taken from the crawl space beneath Gomez's home, and that he heard only part of the conversation between the two men.

Defendant also testified that, at Dogo's direction, he brought some writing paper; that Gomez wrote something on the paper which Dogo took and folded; and that defendant did not look at the paper at any time. Dogo instructed defendant to deliver the note to Mrs. Gomez.

In the meantime, Mrs. Gomez had freed herself and called her son Carlos. She believed that the money taken from the safe belonged to Dogo. Later that day, Mrs. Gomez received a telephone call from defendant. He directed her to go to the public telephones at the intersection of Orr and Day, and Telegraph ["the corner"].

Dogo drove defendant and Cholin to the detail shop where they picked up Cholin's car. They then drove to the corner to deliver the note. Mrs.

---

[3] So indicated at this point in the reporter's transcript. We assume that this is a reference to Dogoberto Rodriguez, who was known as "Dogo."

Gomez went to the corner, but was unable to find a note. Defendant met her and handed her a folded note. He said that she should not worry. Mrs. Gomez returned home and read the note, which was in Spanish in her husband's handwriting. It instructed her to tell their children that he had gone on a trip, not to worry, that he was all right; to go to the bank and take the money and everything they had and give it to defendant and the others. By that time, the banks were closed, so Mrs. Gomez went the next day. She closed out two bank accounts and emptied a safe deposit box, accumulating over $51,000. Neither defendant nor Dogo ever contacted Mrs. Gomez about her husband again.

After delivering the note to Mrs. Gomez, defendant and Cholin did not return to the house where Gomez was being held. Instead, they drove around for a time, drank some beers, then checked into a hotel. Dogo was staying at the same hotel. They remained at the hotel until 8 or 9 a.m. the next morning, October 16, 1986. Defendant and Cholin then went to the detail shop and met Salais and Dogo. Salais gave defendant the keys to the Ford and said: "Here, man. Mario is dead. He is in the trunk of your car."

Defendant fled to Florida, driving a station wagon belonging to Dogo. He delivered that vehicle to an auto shop owned by Dogo in Florida.

Gomez's body was found in the trunk of the Ford on November 4, 1986. His knees and wrists were bound with cord. The cause of death was asphyxia (lack of oxygen) consistent with suffocation from confinement in a small place. There were no signs of strangulation. Due to the extreme decomposition of the body, the forensic pathologist was unable to determine when or where Gomez died. She concluded that it was possible that he died on October 15 or 16. Salais's fingerprint was on a beer bottle found in the car with Gomez's body. Defendant's fingerprints were on the note delivered to Mrs. Gomez.

Defendant stayed with Donna Henshaw until November 18, 1986, and then traveled to Ecuador where his family was located. Henshaw testified that defendant told her that he had hired Salais and Cholin to help him get the money or drugs from Gomez. Defendant also admitted to Henshaw that he was in charge and gave orders to the others inside the house. Defendant did not make any admissions about orders to kill Gomez or how he died. While in South America, defendant spent three days with Dogo in Colombia. He admitted that he made the trip to Colombia to collect money and the title to several automobiles promised by Dogo. They had an argument, and defendant returned to the United States. He was arrested in Florida.

At trial, defendant testified on his own behalf. He admitted participating in the events at the Gomez house, and delivering the note to Mrs. Gomez. According to defendant, Salais was in charge while they were at the house. Defendant testified that he did not know Salais had a gun when they went to the Gomez house on October 15th. When Salais pulled the gun, defendant was terrified and went along out of fear for his life.

He denied knowledge of the contents of the note, that Dogo was holding Gomez for ransom, or that force would be used on Gomez. "When we went into the house" he later testified, "I thought that things were going to be friendly. I thought that they are going to ask him, 'Hey, give me the coke.' And that's that. I never thought anything about guns or I never thought anything about violence. I never thought nothing, never had any idea that this is going to end up like it end up." On cross-examination, defendant admitted that when Dogo told him to take Salais and Cholin to the Gomez house, his thinking was that it "sounds logical for me to take two persons with me to put some pressure with Mario because if I go by myself and Mario beat me up and kick me out of the house easily." He admitted that he believed it was possible that he would have to put pressure on Gomez. He was not present when Gomez died.

Defendant testified that before writing the note, Gomez had a "friendly" conversation about cocaine with Dogo. Defendant had been smoking some of the cocaine taken from Gomez, and was unable to hear all of the conversation from his position. He did hear Gomez tell Dogo that he would pay $50,000 immediately and an additional $100,000 when he sold some property. Defendant admitted that he told Donna Henshaw: "[W]hat happened here . . . we took a guy out of his house and the guy ends up dead."

Defendant testified that he told Dogo he "[didn't] want anymore to do with this," that he "[didn't] like this" and that they "should not take the guy out of the house." He testified that Dogo told him that delivering the note was the "last thing" he had to do and that they were going to let Gomez go. On cross-examination, defendant admitted that he never tried to get away from Salais or Cholin between the entry of the Gomez house and his departure to Florida. He voluntarily stayed with Cholin in the same hotel used by Dogo on October 15, although Cholin did not have a gun. Defendant admitted that he voluntarily delivered a car to Florida for Dogo and visited him in Columbia after learning of Gomez's death. Finally, he admitted that he never told Mrs. Gomez where her husband was being held and that he never went to the police.

DISCUSSION

I

*The Trial Court Properly Reduced the Murder Conviction to Second Degree Murder* [4]

In his closing summation, the prosecutor argued alternative theories of first degree murder. In addition to premeditated murder, the prosecutor argued that defendant was guilty of felony murder on the theory that Gomez had been killed during the commission of an aggravated kidnapping (§§ 187, 189, 209), [5] and that the evidence established defendant's guilt as either a conspirator or an aider and abettor in the aggravated kidnapping of Gomez. The jury was instructed on premeditated murder (CALJIC No. 8.20); first degree felony murder in pursuance of a conspiracy (CALJIC No. 8.26); first degree felony murder as an aider and abettor (CALJIC No. 8.27); unpremeditated (second degree) murder (CALJIC No. 8.30); second degree murder arising from an act dangerous to life (CALJIC No. 8.31); second degree felony murder committed during the commission of aggravated kidnapping (CALJIC No. 8.32); and second degree felony murder in pursuance of a conspiracy to commit kidnapping (CALJIC No. 8.33).

The jury returned general verdicts finding defendant guilty of aggravated kidnapping (§ 209, subd. (a)) and first degree murder. Defendant brought a motion for new trial on the ground that the jury had been erroneously instructed that it could find him guilty of first degree murder committed during a kidnap for ransom, which was not an enumerated felony under the first degree felony murder statute in effect when the crime was committed. The prosecutor argued that the jury necessarily found that all of the elements of second degree felony murder were established because of its separate verdict that defendant was guilty of kidnapping, a crime inherently dangerous to life, and of first degree murder. The trial court agreed that the first degree felony murder instruction was erroneous, but concluded that a conviction of murder in the second degree was proper. The court reduced the first degree murder conviction to second degree murder.

---

[4] Since we are affirming defendant's conviction under section 209, subdivision (a) (see discussion, *post*) which carries a term of life imprisonment without possibility of parole, the effect of our affirmance of the second degree murder conviction, which must be stayed, is of limited practical consequence to defendant. The only practical result of the murder sentence appears to be its bearing on the conditions of defendant's confinement. (See tit. 15, Cal. Code Regs., § 3375, subds. (b) and (e)(9).) Nevertheless, defendant is entitled to an adjudication of the merits of the conviction.

[5] See footnote 1, *ante*.

Section 187 provides in pertinent part: "(a) Murder is the unlawful killing of a human being, or a fetus, with malice aforethought."

■ Where error goes only to the degree of the offense for which a defendant is convicted, the appellate court may reduce the conviction to a lesser degree and affirm the judgment as modified, thereby obviating the necessity for a retrial. (§ 1260; *People* v. *Alexander* (1983) 140 Cal.App.3d 647 [189 Cal.Rptr. 906].) ■ The trial court has the same authority to reduce the degree of the offense in ruling on a motion for new trial. (§ 1181, subd. (6).)

In *Alexander*, a prosecution arising from a race riot at a state prison, the defendant was found guilty of conspiracy to commit first degree murder and conspiracy to commit assault. The trial court had not instructed on the different degrees of murder or on the lesser offenses of voluntary and involuntary manslaughter, nor had instructions explained the circumstances which elevate murder to first degree. But the instructions did "alert the jury as to each element" of the offense of conspiracy to commit second degree murder. The appellate court therefore modified the judgment to reflect a conviction of conspiracy to commit second degree murder. (140 Cal.App.3d at p. 666; see also *People* v. *Jackson* (1984) 152 Cal.App.3d 961, 970 [199 Cal.Rptr. 848] [verdict of attempted murder in the first degree reduced to attempted murder in the second degree due to omission of an instruction relating premeditation to the defendant's mental state defense].) ■ In this case, the jury returned a general verdict of first degree murder after being properly instructed on premeditated first degree murder and erroneously informed that it could find defendant guilty of first degree murder on that theory or as an aider and abettor to murder committed during the commission of a kidnap for ransom. Since it did convict defendant of first degree murder, the jury necessarily accepted one of these theories.

In order to uphold the conviction for second degree murder, we must be able to say as a matter of law that the jury necessarily found that all of the elements of that crime were established. (See *People* v. *Alexander, supra,* 140 Cal.App.3d at p. 666.) ■ Second degree murder may be committed by a deliberate killing, with malice but without premeditation, or by a killing in the course of a felony inherently dangerous to human life. (See *People* v. *Patterson* (1989) 49 Cal.3d 615, 620 [262 Cal.Rptr. 195, 778 P.2d 549].)

■ Premeditated and deliberate murder requires proof that the defendant unlawfully killed with malice aforethought (intent to kill), and that the killing was willful, deliberate and premeditated. (§§ 187, 189; *People* v. *Dillon* (1983) 34 Cal.3d 441, 477 [194 Cal.Rptr. 390, 668 P.2d 697]; *People* v. *Alexander, supra,* 140 Cal.App.3d at p. 665.) ■ Second degree murder may be grounded on a deliberate killing without the "careful"

premeditation required for the higher degree of the crime. (See *People* v. *Rowland* (1982) 134 Cal.App.3d 1, 7 [184 Cal.Rptr. 346].)

■ Nevertheless, on the instructions as given, the jury could have rested its first degree murder verdict on the legally impermissible conclusion that defendant acted as an aider or abettor or a conspirator in the commission of a kidnap for ransom. Since that possibility cannot be excluded, the second degree murder conviction cannot be affirmed on the theory that defendant committed an intentional, but unpremeditated killing. (See *People* v. *Croy* (1985) 41 Cal.3d 1, 19 [221 Cal.Rptr. 592, 710 P.2d 392].)

We therefore turn to the theory that the jury's verdicts necessarily establish all of the elements required to support a conclusion of guilt based on the second degree felony-murder rule.

■ Lacking an explicit statutory definition of second degree felony murder (see *People* v. *Patterson, supra,* 49 Cal.3d 615, 620), California courts apply the definition first stated in *People* v. *Ford* (1964) 60 Cal.2d 772, 795 [36 Cal.Rptr. 620, 388 P.2d 892]: "A homicide that is a direct causal result of the commission of a felony inherently dangerous to human life (other than the six felonies enumerated in Pen. Code, § 189) constitutes at least second degree murder." In *Ford*, the Supreme Court examined the conduct of the defendant in order to determine whether it was inherently dangerous. (60 Cal.2d at p. 795.) That approach was rejected the next year, when the Supreme Court ruled that in determining whether a felony is inherently dangerous, courts must "look to the elements of the felony in the abstract, not the particular 'facts' of the case." (*People* v. *Williams* (1965) 63 Cal.2d 452, 458, fn. 5 [47 Cal.Rptr. 7, 406 P.2d 647].)

In *People* v. *Patterson, supra,* 49 Cal.3d 615, the defendant and amici curiae asked the court to abolish the second degree felony murder doctrine. The People and other amici curiae asked the court to reject the *Williams* abstract analysis approach, and instead to look solely to the actual conduct of the defendant. Noting the widespread criticism of the doctrine by courts and commentators, the *Patterson* court rejected both suggestions. (*Id.* at p. 621.) It held that where a felony statute proscribes an "essentially single form of conduct" the court must examine the statute as a whole to determine a felony's inherent dangerousness. (*Id.* at pp. 623-624.) Where the statute lacks a primary element and, instead, includes a variety of offenses, the proscribed conduct may be severed for the purpose of determining whether it is inherently dangerous. (*Id.* at pp. 624-625.)

Once the court determines whether the conduct proscribed must be severed for analysis, the test of inherent dangerousness is applied to the severed

portion of the statute if severance is permitted, and to the entire statute if it is not. The *Patterson* court maintained the inherent danger test for felonies which will support a conviction for second degree felony murder, but modified its application. "[F]or purposes of the second degree felony-murder doctrine, an 'inherently dangerous felony' is an offense carrying 'a high probability' that death will result." (*People v. Patterson, supra,* 49 Cal.3d at p. 627.)[6] The distinction between the earlier formulation of a felony carrying a "substantial risk of death" and the "high probability of death" test set forth in *Patterson* seems somewhat fine. There may be cases which satisfy one formulation and not the other, but this is not such a case.

We have no doubt that kidnapping for ransom, extortion or reward satisfies the *Patterson* standard. Throughout history, kidnapping has been considered among the most heinous of crimes.[7] In 1872, the California Legislature codified the common law definition of kidnapping. (§ 207.) Motivated by a wave of offenses involving the movement or detention of victims to obtain ransom, in 1901 the Legislature enacted the state's first aggravated kidnapping statute, section 209: "Every person who maliciously, forcibly, or fraudulently takes or entices away any person with intent to restrain such person and thereby to commit extortion or robbery, or exact from the relatives or friends of such person any money or valuable thing, is guilty of a felony, and shall be punished therefor by imprisonment in the state's prison for life, or any number of years not less than ten." (See *People v. Knowles* (1950) 35 Cal.2d 175, 194 [217 P.2d 1] (dis. opn. of Edmonds, J.).)

---

[6]The lead opinion, by Justice Kennard, articulated the new standard. This portion of the lead opinion gained the specific concurrence of three other justices, making a majority of four on the issue. (See Mosk, J. with Broussard, J., conc. and dis. opn. (49 Cal.3d at p. 640; conc. and dis. opn. of Panelli, J., *id.* at p. 641.) Three justices dissented. (See Lucas, C. J., with Eagleson and Kaufman, JJ., conc. and dis., *id.* at p. 627.)

In this case, both sides implicitly assume that the *Patterson* rule is applicable to defendant's murder conviction. The *Patterson* decision was announced in September 1989, nearly two years after commencement of the trial. The issue of retroactivity of this aspect of *Patterson* presents an interesting question (see criteria discussed in *People v. Guerra* (1984) 37 Cal.3d 385, 398 [208 Cal.Rptr. 162, 690 P.2d 635]), but since it was not briefed, and because we conclude that a kidnap for ransom satisfies the *Patterson* test, we need not, and do not, decide that issue. As we point out, *post,* there can be no question that the crime of aggravated kidnapping satisfies the pre-*Patterson* test, since it presents an a fortiori situation to simple kidnapping, which has been consistently held to be a crime involving a substantial risk of death.

[7]Kidnapping has been proscribed since biblical times: "And he that stealeth a man, and selleth him, or if he be found in his hand, he shall surely be put to death." (Exodus 21:16.) Blackstone recognized the ancient origins of the crime: "[K]idnapping, being the forcible abduction or stealing away of man, woman or child from their own country, and selling them into another, was capital by the Jewish law . . . . So likewise, in the civil law, the offense of spiriting away and stealing men and children; which was called plagium and the offenders plagiarii, was punished with death. This is unquestionably a very heinous crime, as it robs the king of his subjects, banishes a man from his country, and may in its consequences be productive of the most cruel and disagreeable hardships; and therefore the common law of England has punished it with fine, imprisonment and pillory." (4 Blackstone, Commentaries 219.)

In the 1920's, an alarming rate of kidnappings for ransom occurred, culminating in the infamous Lindbergh kidnapping. (See *People* v. *Knowles,* *supra*, 35 Cal.2d at pp. 194-195 (dis. opn. of Edmonds, J.) Congress responded by enacting the Federal Kidnapping Act, commonly called the Lindbergh Law, in 1932, at the height of the public outcry over such crimes.[8] One year later, the California Legislature amended section 209 to incorporate most of the language of the Lindbergh Law.[9] (Stats. 1933, ch. 1025, § 1, pp. 2617-2618.) The 1933 amendment omitted the element of asportation which the Lindbergh Law had included, and it increased the penalty to death or life imprisonment without the possibility of parole if the victim suffered bodily harm. Thus, California law, like the federal law, tied the severity of the penalty to the harm suffered by the victim. "Both the federal and California Supreme Courts recognized the augmented penalty's purpose to deter the kidnaper from harming his victim, to induce him to release the victim unharmed." (*In re Maston* (1973) 33 Cal.App.3d 559, 563 [109 Cal.Rptr. 164], citing *Robinson* v. *United States* (1945) 324 U.S. 282, 284 [89 L.Ed. 944, 946, 65 S.Ct. 666]; *People* v. *Jackson* (1955) 44 Cal.2d 511, 517 [282 P.2d 898].) This rationale is premised on a recognition of the extreme danger inherent in kidnapping for ransom.

An amendment in 1951 made asportation an element of kidnapping to commit robbery. In 1973, section 209 was reenacted and the death penalty was made mandatory in cases where the victim died.[10] From 1951 to 1976 the courts treated kidnapping for ransom and kidnapping for robbery as separate offenses, even though both were housed in the same section of the

---

[8] The Lindbergh Law provided: "[W]hoever shall knowingly transport or cause to be transported, or aid or abet in transporting, in interstate or foreign commerce, any person who shall have been unlawfully seized, confined, inveigled, decoyed, kidnaped, abducted, or carried away by any means whatsoever and held for ransom or reward shall, upon conviction, be punished by imprisonment in the penitentiary for such term of years as the court, in its discretion, shall determine . . . ." (47 Stat. 326, 18 U.S.C. § 1201 (1932) as amended.) Within two years, the Lindbergh Law was amended to impose the death penalty unless the victim was freed unharmed. (48 Stat. 781, 18 U.S.C. § 1201 (1934).)

[9] As amended, section 209 provided: "Every person who seizes, confines, inveigles, entices, decoys, abducts, conceals, kidnaps or carries away any individual by any means whatsoever with intent to hold or detain, or who holds or detains, such individual for ransom, reward or to commit extortion or robbery or to exact from relatives or friends of such person any money or valuable thing, or who aids or abets any such act, is guilty of a felony and upon conviction thereof shall suffer death or shall be punished by imprisonment in the State prison for life without possibility of parole, at the discretion of the jury trying the same, in cases in which the person or persons subjected to such kidnaping suffers or suffer bodily harm or shall be punished by imprisonment in the State prison for life with possibility of parole in cases where such person or persons do not suffer bodily harm."

[10] The 1973 amendment was part of a more general revision of the California death penalty statute in response to the United States Supreme Court's decision in *Furman* v. *Georgia* (1972) 408 U.S. 238 [33 L.Ed.2d 346, 92 S.Ct. 2726]. (See Stats. 1973, ch. 719, § 8, p. 1300; *Review of Selected 1973 California Legislation* (1974) 5 Pacific L.J. 205, 325.) (See discussion, *post*.)

Penal Code, because only kidnapping for robbery required asportation of the victim. In 1976, as part of the determinate sentencing law, this construction was codified by designating kidnapping for ransom, extortion or reward as subdivision (a) of section 209, and kidnapping for robbery as subdivision (b), of that section. In 1977 the Legislature abolished the death penalty for aggravated kidnapping. (Stats. 1977, ch. 316, § 15, p. 1262.) Finally, in 1982, the Legislature amended section 209 to broaden the imposition of the maximum penalty to kidnappers who intentionally confine a victim "in a manner which exposes such person to substantial likelihood of death".[11]

■ As seen by this analysis, the courts as well as the Legislature have distinguished between kidnapping for ransom and kidnapping for robbery since 1951, when asportation was added as a requirement for the latter. Since then, subdivisions (a) and (b) of section 209 have defined separate crimes. The subdivision (a) crime only applies where a person is held in order to force a payment of some kind to the perpetrator. Most importantly it does not require an asportation and therefore can be committed even though no "kidnapping" occur; within the common law and general usage of that term. The subdivision (b) crime occurs whenever the victim is taken away for purpose of robbery. It is a true kidnapping offense, because an asportation is required. While both crimes involve an invasion of the victim's liberty, they do not share a "primary element" within the meaning of *Patterson*.[12] We therefore analyze section 209, subdivision (a) separately to determine whether, in the abstract, the crime it proscribes presents a high probability of death, supporting a conviction of second degree felony murder.

We need not, and do not, decide whether simple kidnapping or kidnapping for robbery satisfies *Patterson*. No cases have been decided on that issue since the "high probability of death" standard was announced in that decision. Nevertheless, it is instructive to note that under the "inherently dangerous to life" test that preceded *Patterson*, courts have consistently

[11] This amendment appears to be a direct response to *People* v. *Schoenfeld* (1980) 111 Cal.App.3d 671 [168 Cal.Rptr. 762], in which the court examined the punishment of the three kidnappers of schoolchildren from Chowchilla. The children and bus driver were buried alive in a school bus. The Schoenfeld court concluded that since none suffered bodily injury, the evidence did not support imposition of a sentence of life imprisonment without possibility of parole. (*Selected 1982 California Legislation* (1983) 14 Pacific L.J. 357, 601-602.)

[12] Although we analyze section 209, subdivisions (a) and (b) as separate crimes, we believe aggravated kidnapping for ransom, extortion or reward is a single crime, even though the offense may be committed in a large number of ways (e.g. seizing, confining, inveigling) and for any one of several related purposes (e.g., for ransom, reward or to commit extortion). (See *People* v. *Henderson* (1977) 19 Cal.3d 86, 93 [137 Cal.Rptr. 1, 560 P.2d 1180] [similar analysis based upon false imprisonment statute, § 237].) Each of these forms of the aggravated offense shares the single primary element of deprivation of a person's liberty in order to extract a financial gain.

held that even simple kidnapping presents an inherent danger to human life. (See also *People* v. *Ford, supra*, 60 Cal.2d at p. 795; *People* v. *Ford* (1966) 65 Cal.2d 41, 57 [52 Cal.Rptr. 228, 416 P.2d 132]; *People* v. *Kelso* (1976) 64 Cal.App.3d 538, 541-542 [134 Cal.Rptr. 364]; *People* v. *Romo* (1975) 47 Cal.App.3d 976, 989 [121 Cal.Rptr. 684], disapproved on other grounds in *People* v. *Anderson* (1987) 43 Cal.3d 1104, 1122-1123 [240 Cal.Rptr. 585, 742 P.2d 1306]; and *People* v. *Bolton* (1979) 23 Cal.3d 208, 213-214 [152 Cal.Rptr. 141, 589 P.2d 396].) A kidnap for robbery presents an a fortiori case, under the pre-*Patterson* standard.

The danger inherent in simple kidnapping and kidnapping for robbery is based in part on the asportation of the victim. While section 209, subdivision (a) does not require asportation, kidnap for ransom, extortion or reward has other features that heighten the danger to the victim. "By legislatively and judicially recognized contemporary standards, kidnaping is one of the most serious of all crimes. [Citations.] By its very nature it involves violence or forcible restraint . . . . Kidnapings for ransom are coldly planned, deliberate schemes. They are still endemic to the American scene." (*In re Maston, supra*, 33 Cal.App.3d at p. 563.) As one commentator has observed: "It has been pointed out by some that kidnapping for ransom inherently presents a combination of factors creating a substantial risk of bodily harm. In the ransom situation, 'forcible control is necessary to effect secret confinement; the offense requires a protracted concealment; the confinement becomes more difficult to maintain when the kidnapper's flight ultimately becomes necessary; and the victim's release grows increasingly dangerous with the passage of time.' Accordingly, a demand for ransom generally involves an express or an implied threat of death or great bodily harm." (Enright, *California's Aggravated Kidnapping Statute—A Need for Revision* (1967) 4 San Diego L.Rev. 285, 309, fn. omitted; see also Comment, *A Rationale of the Law of Kidnapping* (1953) Colum. L.Rev. 540, 557.) A kidnap for extortion or reward presents no lesser risk.

We conclude that aggravated kidnapping for ransom, extortion or reward (§ 209, subd. (a)) is an offense carrying "a high probability" that death will result. It therefore is an offense inherently dangerous to human life, and supports a conviction for second degree felony murder.

██ In our case, the guilty verdict of first degree murder necessarily established that defendant committed an unlawful killing, whether by premeditation or in the course of a felony. The aggravated kidnapping conviction established that defendant committed a felony that, as a matter of law, is inherently dangerous to human life. In combination, these verdicts necessarily establish each of the elements of second degree felony murder. There

was no error in the reduction of defendant's conviction to second degree murder on that basis.

## II

### *The Trial Court Properly Instructed on Kidnapping*

Defendant contends that the trial court erred in instructing the jury on the elements of aggravated kidnapping because it did not define extortion. Respondent argues that only the popular definition of the term "extortion" was relevant here, and that a failure to define it, if error at all, was harmless. We reject defendant's contention and find no prejudicial error.

In pertinent part, section 209, subdivision (a) requires that a person be taken, carried away, or held "for ransom, reward or to commit extortion or to exact from another person any money or valuable thing, or any person who aids or abets any such act, is guilty of a felony . . . ." The court instructed the jury in the language of CALJIC No. 9.22, defining aggravated kidnapping, which tracks the statutory language.[13] That instruction informed the jury that in order to convict, it had to find that the kidnapping of Gomez had been "done with the specific intent [to hold or detain such other person for ransom] or [to commit extortion] or [to obtain something of value from another]."

There is no need to instruct a jury on the meaning of terms in common usage, which are presumed to be within the understanding of

---

[13] As given, CALJIC No. 9.22 (1982 rev.) read: "[Defendant is charged in [Count I of] the information with the commission of the crime of violation of Section 209 of the Penal Code.] [¶] Every person who [seizes,] [confines,] [abducts,] [conceals,] [kidnaps] [or] [carries away] [holds] [detains] any individual by any means whatsoever with the specific intent to hold or detain such individual for ransom, reward, or to commit extortion, [or to exact from another any money or valuable thing,] is guilty of the crime of violation of Section 209 of the Penal Code. [¶] [It is not essential to such crime that the person be carried or otherwise moved for any distance, or at all.] [¶] In order to prove the commission of the crime of violation of Section 209 of the Penal Code, each of the following elements must be proved beyond a reasonable doubt: 1. That a person was seized, confined, abducted, concealed, kidnaped, carried away, held, or detained, and [¶] 2. That the kidnaping of such person was done with the specific intent [to hold or detain such other person for ransom] or [to commit extortion] or [to obtain something of value from another]. [¶] [If you should find the defendant guilty of the charge against him [under Count I], you must also find whether the person kidnaped [suffered bodily harm in connection with or as a result of an act done by the defendant in the commission of the crime] [or] [whether the defendant intentionally confined the person kidnaped in a manner which exposed such person to a substantial likelihood of death] and state your decision in that respect in your verdict. [¶] 'Bodily harm' as that term is used in this instruction, means substantial injury to the body of a person who was kidnaped by the application of physical force above and in addition to the force which is necessarily involved in the commission of such kidnaping.]"

persons of ordinary intelligence. (See *People* v. *Chavez* (1951) 37 Cal.2d 656, 668 [234 P.2d 632]; *People* v. *Anderson* (1966) 64 Cal.2d 633, 640 [240 Cal.Rptr. 585, 742 P.2d 1306].) "Ransom" is such a term, but defendant argues that "extortion" is not, and hence that the instruction on kidnapping was insufficient. He cites *People* v. *Hill* (1983) 141 Cal.App.3d 661, 668 [190 Cal.Rptr. 628], for this proposition. In *Hill*, defendant entered a fast food restaurant and demanded money. Told that the safe could not be opened, he forced an employee to cross the street with him and told the manager to deliver $500 or he would kill the employee. The trial court instructed on kidnap for the purpose of robbery. Since defendant was charged with kidnap for ransom or extortion (§ 209, subd. (a)), the appellate court held that the instruction could have misled the jury into thinking that kidnap for robbery was the same as kidnap for extortion. The court also said that while "extortion" may be understandable in a general sense, it had a peculiar meaning in the kidnap law, and should have been defined. The court evidently considered that extortion under the kidnapping statute requires the obtaining of property from another by means of a coerced consent, while the general extortion statute (§ 518) is satisfied by the extorted obtaining of either property or an official act. (See *People* v. *Beggs* (1918) 178 Cal. 79; 2 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Crimes Against Property, § 648, p. 729; and see CALJIC No. 14.71.) However significant that definition may be when extortion is contrasted with robbery, as it was in *Hill*, it is of little consequence in our case.

Here, the prosecutor's entire kidnapping summation to the jury was based on kidnapping for ransom; extortion was not mentioned. The prosecutor focused his argument on the note defendant delivered to Mrs. Gomez, characterizing it as a ransom note sufficient to support conviction for kidnap for ransom. While the evidence was sufficient to support an instruction on kidnapping for the purpose of extortion (see *People* v. *Superior Court* (*Deardorf*) (1986) 183 Cal.App.3d 509 [228 Cal.Rptr. 137]; *People* v. *Martinez* (1984) 150 Cal.App.3d 579, 602 [198 Cal.Rptr. 565]), the felony-murder theory of the prosecution was restricted to a kidnap for ransom.

Surely, it would have been better for the trial court to have stricken the phrase "or to commit extortion." But the import of the term "extortion" in this case could not have been misunderstood. It was that Mrs. Gomez was to turn over money to defendant and his cohorts or Mr. Gomez would be harmed. The failure to define extortion in this context was harmless. (See *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

### III

*An Instruction in Terms of CALJIC No. 17.01 Was Not Required*

Appellant next contends that the trial court erred in not instructing the jury sua sponte in the language of CALJIC No. 17.01, which requires the jury to agree on a particular act constituting a charged crime where the conviction can be based on more than one act.[14] This argument, as well as defendant's arguments asserting error for failure to instruct on a lesser included offense and challenging the sufficiency of the evidence, turns on his characterization of the events as two separate crimes. Defendant contends that the events occurring at the Gomez house comprise one offense, while the later events during which Gomez was taken away and died, comprise a second, separate offense. His argument is not well taken. ▮▮▮ Where there is a continuing crime, such as kidnapping, a "particular act" instruction is not required. (*People* v. *Masten* (1982) 137 Cal.App.3d 579, 588 [187 Cal.Rptr. 515], overruled on other grounds in *People* v. *Jones* (1988) 46 Cal.3d 585, 600 [250 Cal.Rptr. 635, 758 P.2d 1165]; *Parnell* v. *Superior Court* (1981) 119 Cal.App.3d 392, 407 [173 Cal.Rptr. 906].)

This case falls within that principle. Defendant was in California for the express purpose of reclaiming drugs or money from Gomez. He directed the activities at the house in which Gomez was detained and obtained money, jewelry and drugs from the rear bedroom. The value of these items apparently was less than defendant had been directed to obtain. At defendant's direction, Gomez was then taken in the trunk of the car to Dogo, who also had come to California from his Florida residence. The victim never regained his liberty. Even if the defendant did not personally plan to extort or ransom, a conclusion which defies credulity on this record, at a minimum he aided and abetted the kidnapping of Gomez within the meaning of section 209, subdivision (a). The kidnapping was a continuous act. There was no duty to instruct in the language of CALJIC No. 17.01.

---

[14]CALJIC No. 17.01 provides: "The defendant is accused of having committed the crime of _____ [in Count _____ ]. The prosecution has introduced evidence tending to prove that there is more than one [act] [or] [omission] upon which a conviction [on Count _____ ] may be based. Defendant may be found guilty if the proof shows beyond a reasonable doubt that [he] [she] committed any one or more of such [acts] [or] [omissions]. However, in order to return a verdict of guilty [to Count _____ ], all jurors must agree that [he] [she] committed the same [act] [or] [omission] [or] [acts] [or] [omissions]. It is not necessary that the particular [act] [or] [omission] agreed upon be stated in your verdict."

## IV

### *The Evidence Is Sufficient to Sustain The Kidnapping Conviction*

Defendant contends that the evidence does not establish a specific intent to kidnap "for ransom, reward or to commit extortion or to exact from another person any money or valuable thing." He also argues that the evidence does not establish that the kidnapping was motivated for the purpose of obtaining ransom or reward, but that it establishes no more than that defendant and his cohorts kidnapped Gomez to deliver him to Dogo, who then decided Gomez's fate.

 The test for sufficiency of the evidence is whether, reviewing the whole record in the light most favorable to the judgment below, substantial evidence is disclosed such that a reasonable trier of fact could find the essential elements of the crime to be proven beyond a reasonable doubt. (*People* v. *Johnson, supra,* 26 Cal.3d 557, 578.) We must presume in support of the judgment the existence of every fact the jury could reasonably deduce from the evidence. (*People* v. *Reilly* (1970) 3 Cal.3d 421, 425 [90 Cal.Rptr. 417, 475 P.2d 649].)

 There is substantial evidence that defendant directed the events at the Gomez house for the purpose of obtaining either drugs or money. He told his confederates to put Gomez in the trunk and told Mrs. Gomez that he might not return; he personally possessed and then delivered the note to Mrs. Gomez that asked that she turn over the family's money in bank accounts and in a deposit box to defendant and his cohorts. And he knew that Gomez had been carried off against his will in the trunk of defendant's car. These acts establish that defendant was a willing and continuing participant in a crime designed to carry off and hold Gomez until the property sought from him had been obtained. (See *People* v. *Superior Court (Deardorf), supra,* 183 Cal.App.3d 509, 514.) It was not necessary to present direct evidence of a meeting between the parties or the words they used in agreeing to perform the unlawful acts; their agreement may be inferred from their conduct in carrying out the conspiratorial purpose. (See *People* v. *Lipinski* (1976) 65 Cal.App.3d 566, 575 [135 Cal.Rptr. 451].)

Defendant's guilt is also supported by substantial evidence that he acted as an aider and abettor. If an aider and abettor's acts are undertaken with the intent of facilitating the perpetrator's objective, the aider and abettor is guilty of any offense committed in furtherance of that objective. (*People* v. *Croy, supra,* 41 Cal.3d 1, 12, fn. 5.) Proof of the aider and abettor's intent may be inferred from the defendant's acts, done with knowledge of the probable consequences. (*People* v. *Jones* (1980) 108 Cal.App.3d

9, 15 [166 Cal.Rptr. 131].) The trier of fact may also consider the defendant's conduct before and after the crime, and the defendant's failure to take steps to prevent the commission of the crime. (*Ibid.*) ■■■ In this case, there was substantial evidence from which the jury could conclude that defendant intended to facilitate Dogo's purpose of obtaining drugs or money from the Gomez family by threatening Gomez with bodily harm and by confining him in a manner which exposed him to a substantial likelihood of death.

## V

### *The Court was Not Required to Instruct on False Imprisonment*

Defendant argues that the court erred in failing to instruct the jury, sua sponte, on the necessarily included lesser offense of false imprisonment.[15] ■■■ Generally, the jury must be instructed on crimes that are necessarily included within the offense charged (see *People* v. *Melton* (1988) 44 Cal.3d 713, 746 [244 Cal.Rptr. 867, 750 P.2d 741]), and the jury was instructed on simple kidnapping as a lesser included offense. False imprisonment also is a lesser included offense of aggravated kidnapping. (*People* v. *Morrison* (1964) 228 Cal.App.2d 707, 713 [39 Cal.Rptr. 874].) But a lesser included offense instruction on false imprisonment is not required where the evidence establishes that defendant was either guilty of kidnapping or was not guilty at all. (See *People* v. *Kelly* (1990) 51 Cal.3d 931, 959 [275 Cal.Rptr. 160, 800 P.2d 516]; *People* v. *Leach* (1985) 41 Cal.3d 92 [221 Cal.Rptr. 826, 710 P.2d 893].) That is the case here; defendant's conduct either went beyond the mere violation of Gomez's personal liberty, or it was not culpable. As we have seen, there was ample evidence that in addition to the initial confinement of Gomez at his home, defendant directed that he be conveyed in the trunk of a car to Dogo, who was seeking to hold him as a means of forcing Mrs. Gomez to pay him money. There was no error in not giving a sua sponte instruction on false imprisonment.

## VI

### *The Kidnap Felony Murder Provision of the Death Penalty Law Is Not a Special Statute That Preempts the Aggravated Kidnapping Law*

Defendant invokes the "special versus general" doctrine of statutory construction, arguing that the specific statutes governing the punishment

---

[15] Section 236 provides: "False imprisonment is the unlawful violation of the personal liberty of another."

Section 237 provides: "False imprisonment is punishable by fine not exceeding one thousand dollars ($1,000), or by imprisonment in the county jail not more than one year, or by both. If such false imprisonment be effected by violence, menace, fraud, or deceit, it shall be punishable by imprisonment in the state prison."

for murder are "special laws" that preempt the "general" statute governing aggravated kidnapping. (See *In re Williamson* (1954) 43 Cal.2d 651, 654 [276 P.2d 593].)

Defendant offers the following syllogism. First he points out that a homicide committed in the course of a simple or aggravated kidnapping is a special circumstance for the purpose of the death penalty law. (See § 190.2, subd. (a)(17)(ii).) He then points out that under the death penalty law, neither life imprisonment without the possibility of parole nor death may be imposed on an aider and abettor without an intent to kill. (*People* v. *Anderson* (1987) 43 Cal.3d 1104, 1138-1139 [240 Cal.Rptr. 585, 742 P.2d 1306].) Finally, he points out that section 209, subdivision (a), the aggravated kidnapping statute involved in this case, permits life imprisonment without possibility of parole where the victim dies or suffers bodily injury, even though the aider and abettor does not harbor an intent to kill. From these premises he concludes that the kidnapping felony murder special circumstance is a "special" law that preempts aggravated kidnapping under section 209, subdivision (a), preventing imposition of life imprisonment without possibility of parole on an aider and abettor unless there is a finding of intent to kill. As we have discussed, given the jury verdicts and the instructions on which they were based, we cannot say the jury necessarily concluded that defendant intended to kill Gomez. We therefore must analyze the issue on the assumption that it did not.

 Under *In re Williamson, supra*, 43 Cal.2d 651 and the cases that have applied it, a "special" statute preempts a "general" law where either (1) each element of the general statute corresponds to an element on the face of the specific statute, or (2) while the elements are not identical, it appears from the entire context of the statutes that a violation of the special statute will necessarily or commonly result in a violation of the general statute. (See *People* v. *Jenkins* (1980) 28 Cal.3d 494, 501 [170 Cal.Rptr. 1, 620 P.2d 587].)

 The *Williamson* delineation exposes a fundamental flaw in defendant's argument. The death penalty law does not define a crime but merely imposes punishment if certain circumstances are established. The aggravated kidnapping statute defines crimes and specifies punishment. The circumstance that the facts proven against defendant did not put him at risk of death or otherwise bring him under the death penalty law does not mean that he cannot be punished for the crime he did commit.

 It also must be recalled that the "special" versus "general" rule is simply an aid to proper construction of a statute. (See *In re Frank F.* (1979)

90 Cal.App.3d 383, 386 [153 Cal.Rptr. 375], and cases cited.) As with any issue of statutory construction, the task of the court is to apply the statute in a manner that is faithful to the intent of the enacting agency (the Legislature or, in cases of initiative laws, the People).

A review of the history of the two statutory schemes demonstrates the implausibility of the preemption inference. The Legislature has consistently revised the death penalty law in concert with amendments to section 209, often doing so in the same statute. In 1973, the statute imposing the penalty of death for murders committed in certain special circumstances also rewrote the provisions of section 209 to provide for the death penalty in cases of aggravated kidnapping where the victim died, and life imprisonment without the possibility of parole where the victim suffered bodily harm. (Stats. 1973, ch. 719, §§ 5, 7, and 8, pp. 1299-1300.) Again, in 1977 when the Legislature enacted a new death penalty law, a provision of the statute abolished the death penalty for aggravated kidnapping under section 209 subdivision (a) but maintained the mandatory sentence of life imprisonment without possibility of parole where the victim suffered bodily injury or death. (Stats. 1977, ch. 316, § 15, pp. 1262-1263.)

Defendant bases his preemption argument on the 1978 death penalty initiative which left the formula of section 209, subdivision (a) unchanged while again imposing the penalty of death for murders committed during the commission of kidnapping under either section 207 or 209. He argues that the electorate sought to establish a cohesive and rational scheme for murder in 1978, which mandates that all murders occurring during a kidnapping be punished only under the murder statutes rather than under the kidnapping statutes.

This argument ignores the legislative history. As we have seen, the separate punishments under the kidnapping law and under the death penalty law for deaths occurring during a kidnapping had been in existence for five years prior to the enactment of the 1978 initiative. The present penalty provisions of section 209, subdivision (a) were enacted in concert with the development of the death penalty statutes. There is nothing in the 1978 initiative that suggests an intention of the electorate to change the historic separate and distinct treatment of murder with special circumstances, and aggravated kidnapping. We conclude that section 209, subdivision (a) is not preempted by the death penalty statute.

## VII

*The Sentence Does Not Violate Constitutional Proscriptions*

### A. *Cruel and Unusual Punishment*

Defendant contends that the sentencing scheme under which he may be confined to prison for life without possibility of parole violates the state and federal prohibitions against cruel and unusual punishments. (U.S. Const., 8th & 14th Amends.; Cal. Const., art. I, § 17.) The selection of a proper penalty for a criminal offense is a legislative function involving an appraisal of the evils to be corrected, the weighing of practical alternatives, and consideration of relevant policy factors and responsiveness to the public will. (*In re Lynch* (1972) 8 Cal.3d 410, 423 [105 Cal.Rptr. 217, 503 P.2d 921]; *People* v. *Noble* (1981) 126 Cal.App.3d 1011, 1018 [179 Cal.Rptr. 302].) While the Legislature is accorded " 'the broadest discretion possible in enacting penal statutes and in specifying punishment for crime, . . . the final judgment as to whether the punishment it decrees exceeds constitutional limits is a judicial function.' " (*People* v. *Ladanio* (1989) 211 Cal.App.3d 1114, 1119 [260 Cal.Rptr. 12], quoting from *People* v. *Anderson* (1972) 6 Cal.3d 628, 640 [100 Cal.Rptr. 152, 493 P.2d 880].)

 A punishment is excessive under the Eighth Amendment if it involves the "unnecessary and wanton infliction of pain" or if it is "grossly out of proportion to the severity of the crime." (*Gregg* v. *Georgia* (1976) 428 U.S. 153, 173 [49 L.Ed.2d 859, 875, 96 S.Ct. 2909].) A punishment may violate article I, section 17 of the California Constitution if it " 'is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity.' " (*People* v. *Ladanio, supra,* 211 Cal.App.3d at p. 1119, quoting from *In re Lynch, supra,* 8 Cal.3d at p. 424, fn. omitted.) In *Ladanio,* the court considered a challenge on cruel and unusual punishment grounds where a juvenile was sentenced to life in prison for attempted murder under a sentencing scheme that rendered him ineligible for commitment to the Youth Authority, although a juvenile convicted of murder was eligible for commitment to the Youth Authority. The court found no violation of the constitutional proscription. It reasoned that " 'Although there may be no affirmative indication that the drafters . . . had this consequence in mind, by the same token there is similarly no indication that the drafters intended to preclude the normal application of section 1731.5.' [Citation omitted.] In the absence of statutory ambiguity or other constitutional infirmity, we cannot disregard the plain language of these statutes." (211 Cal.App.3d at p. 1119; quoting *In re Jeanice D.* (1980) 28 Cal.3d 210, 218 [168 Cal.Rptr. 455, 617 P.2d 1087].)

Challenges that the penalty of life without the possibility of parole constitutes cruel and unusual punishment have been raised and rejected many times in the context of aggravated kidnapping for robbery. (See *People* v. *McKinney* (1979) 95 Cal.App.3d 712, 746 [157 Cal.Rptr. 414]; *People* v. *Isitt* (1976) 55 Cal.App.3d 23, 31 [127 Cal.Rptr. 279]; *In re Matson, supra*, 33 Cal.App.3d 559, 565-566.) In *McKinney*, after reviewing the legislative history, the court concluded: "The will of the People seems clear. Life without possibility of parole is not an unconstitutional punishment for kidnapping to commit robbery with bodily harm . . . . Still less should it be so when the victim dies as [the victim here] died, pursuant to a carefully executed plan." (*People* v. *McKinney, supra*, 95 Cal.App.3d at p. 746.)

▮ Here the legislative intent is equally clear. Aggravated kidnapping for ransom involves an inherent danger to the life of the victim; the penalty provisions for the crime are tied to this risk of harm. The punishment is particularly sustainable in this case. Here, as in *McKinney*, the victim died in the commission of a kidnapping for ransom, executed after two unsuccessful prior attempts, with substantial evidence of planning. Defendant had been sent to California to obtain drugs or money from Gomez; he hired two accomplices and purchased the car used in the crime under an assumed name; the kidnappers arrived at the Gomez house with a weapon and duct tape to bind their victims; they transported Gomez in the trunk of the car; Dogo, who resided in Florida, was in California for this occasion. Gomez was suffocated to death. Under these circumstances, we conclude that the sentence of life without possibility of parole is not disproportionate to the crime and therefore is not a cruel or unusual punishment under either the California or federal Constitution.

## B. *The Sentence Does Not Violate Equal Protection or Due Process*

Defendant contends that the same sentencing disparity on which he bases his special versus general statutory construction argument constitutes a deprivation of his constitutional rights to equal protection of the law and to due process of law.

▮ The right to equal protection mandates that persons who are similarly situated with respect to the purpose of a law receive like treatment. (*People* v. *Macias* (1982) 137 Cal.App.3d 465, 472 [187 Cal.Rptr. 100].) Persons convicted of different crimes are not similarly situated for equal protection purposes. (*Id.* at p. 473.) In California, the Legislature's determination of the punishment for crime is subject to the rational basis test: "The decision of how long a particular term of punishment should be is left properly to the Legislature. The Legislature is responsible for determining which class of crimes deserves certain punishment and which crimes should

be distinguished from others. As long as the Legislature acts rationally, such determinations should not be disturbed." (*People* v. *Flores* (1986) 178 Cal.App.3d 74, 88 [223 Cal.Rptr. 465].) Thus, in *Flores* the court held that the Legislature's determination to impose the same punishment on those convicted of attempted first degree murder as on those convicted of attempted second degree murder was rationally related to the punishment for attempted murder.

■ Defendant argues that he was subjected to a greater sentence than are aiders and abettors who are sentenced on the basis of a conviction for second degree felony murder committed during an aggravated kidnapping. But as we have seen, the crime of aggravated kidnapping differs from second degree felony murder committed during a kidnapping. In *People* v. *Macias, supra*, 137 Cal.App.3d 465, the court rejected an equal protection argument, even though the sentencing scheme for attempted murder did not distinguish between attempted first degree murder and attempted second degree murder. The court observed that the Legislature's failure to address this issue during a 54-year period "reflects an intent to relate the punishment for attempt to the maximum penalty established for the underlying crime. While not identically situated, each attempted murderer has attempted to commit a crime so heinous that its successful completion has been legislatively (and in the case of second degree murder, by the electorate) deemed potentially worthy of imprisonment for life." (*Id.* at p. 475.) The *Macias* court held that there was a rational basis for this statutory sentencing scheme and rejected the equal protection argument. (*Ibid.*)

The classification of aggravated kidnapping for ransom as a crime that warrants the imposition of life imprisonment without possibility of parole on an aider and abettor where the victim dies or suffers bodily injury satisfies the rational basis test. This punishment scheme is a direct result of efforts by the Legislature to punish defendants who either take a life or cause bodily injury during a kidnapping. The Legislature has provided a lesser penalty for defendants convicted of kidnapping during the course of a robbery. (§ 209, subd. (b).) We reject defendant's equal protection argument.

■ Defendant also contends that the disparity in sentencing violates his right to procedural due process because it is predicated on the trial court's choice of crime to be used as the base term for sentencing, rather than on culpability. But so long as the statute is procedurally fair and is reasonably related to a proper legislative goal, there is no procedural due process violation. (*People* v. *Flores, supra*, 178 Cal.App.3d at p. 83.) We can see no constitutional violation in a statutory scheme that permits (or even compels) a court to use the most serious crime according to punishment as

the base term in sentencing. This is a sentence choice properly given to the trial courts. (See *People* v. *Barela* (1983) 145 Cal.App.3d 152, 156 [193 Cal.Rptr. 257].)

## VIII

*The Court Properly Exercised Its Sentencing Choice*

■■■ Defendant contends that the court erroneously sentenced him to life imprisonment without possibility of parole because it believed that it had no other choice. A criminal defendant is to be sentenced by a court fully aware of the scope of its discretionary powers. (See *People* v. *Belmontes* (1983) 34 Cal.3d 335, 348, fn. 8 [193 Cal.Rptr. 882, 667 P.2d 686].) Here, the record reflects that the trial court was fully cognizant of its discretion in sentencing defendant to life imprisonment without possibility of parole for aggravated kidnapping. The court recognized that it could sentence defendant on the second degree murder conviction as the base sentence, but chose not to do so. At the suggestion of defendant's counsel, the court even considered the possibility of sentencing defendant on the first degree murder conviction reached by the jury. In light of the instructional error that we have discussed, it properly rejected that course. Its sentence choice was well within the proper exercise of its discretion.

## IX

*The Judgment Must Be Modified in Light of Penal Code Section 654*

Finally, defendant contends and respondent concedes that the trial court erred in failing to stay the concurrent sentence imposed for second degree murder pending the completion of the sentence imposed for kidnap for ransom. ■■■ Section 654 precludes multiple punishment for indivisible acts.[16] It is the defendant's intent and objective, not the "temporal proximity" of his crimes, which we examine to determine whether section 654 applies. "We have traditionally observed that if all the offenses were merely incidental to, or were the means of accomplishing or facilitating one objective, defendant may be found to have harbored a single intent and therefore may be punished only once." (*People* v. *Harrison* (1989) 48 Cal.3d 321, 335 [256 Cal.Rptr. 401, 768 P.2d 1078].) ■■■ In this case, defendant committed a kidnap for ransom during which the victim was killed. His conduct as a participant in the aggravated kidnapping and in the second degree

---

[16]Section 654 provides: "An act or omission which is made punishable in different ways by different provisions of this code may be punished under either of such provisions, but in no case can it be punished under more than one; an acquittal or conviction and sentence under either one bars a prosecution for the same act or omission under any other."

murder are indistinguishable, and he cannot be punished for both crimes. We therefore modify the abstract of judgment by staying the sentence for second degree murder pending completion of the term of life imprisonment without possibility of parole imposed for kidnapping under section 209, subdivision (a). (See *People* v. *Salazar* (1987) 194 Cal.App.3d 634, 639 [239 Cal.Rptr. 746].)

## DISPOSITION

The abstract of judgment is modified by staying the sentence imposed for second degree murder until the completion of the term imposed for aggravated kidnapping, at which time the stay shall become permanent. The judgment is otherwise affirmed.

Woods (A. M.), P. J., and George, J., concurred.

Appellant's petition for review by the Supreme Court was denied March 28, 1991.