Filed 1/23/23  P. v. Ordonez CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MARCO TULIO ORDONEZ,<br><br>    Defendant and Appellant. | B313101<br><br>(Los Angeles County<br>Super. Ct. No. A539261) |

APPEAL from an order of the Superior Court of Los Angeles County, Mike Camacho, Judge.  Affirmed.

Victor J. Morse, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, David E. Madeo and Nicholas J. Webster, Deputy Attorneys General, for Plaintiff and Respondent.

# INTRODUCTION

In 1988, petitioner Marco Tulio Ordonez was convicted of aggravated kidnapping (Pen. Code, § 209, subd. (a)[1]) and second degree murder (§ 187). He was sentenced to a term of life without possibility of parole on the aggravated kidnapping conviction; his concurrent term of 15 years to life on the murder conviction was stayed under section 654.

In January 2019, Ordonez filed a petition for resentencing on the murder conviction under former section 1170.95, now section 1172.6.[2] Following an evidentiary hearing, the trial court denied the petition on the grounds that Ordonez was a major participant in the underlying felony who acted with reckless indifference to human life, and he was therefore ineligible for resentencing. On appeal, Ordonez asserts the court's findings were not supported by substantial evidence. We disagree, and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.  Background

1.  *Evidence presented at trial*

Ordonez's conviction was affirmed in our previous opinion, *People v. Ordonez* (1991) 226 Cal.App.3d 1207 (*Ordonez*).[3]

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

[2]     Effective June 30, 2022, section 1170.95 was renumbered section 1172.6, with no change in text (Stats. 2022, ch. 58, § 10).

[3]     In the following paragraphs, we repeat verbatim the "general summary" of the facts presented at trial in 1988, as described in that opinion. We have added some additional facts from the record, indicated by brackets.

Defendant, Marco Ordonez, was employed as a mechanic in Florida by Dogoberto Rodriguez (referred to as "Dogo"[4] in the record, and hereafter in this opinion) in the summer of 1986. Defendant had known Dogo for three to eight years. In July, 1986, Dogo sent defendant to California on a business trip regarding motors. Dogo, who had a cocaine distribution business in Los Angeles, told defendant to familiarize himself with the area. After defendant returned to Florida, Dogo again sent him to southern California, telling him to "keep an eye" on Mario Gomez ("Gomez"), who was apparently a member of Dogo's cocaine distribution network.

Following Dogo's orders, defendant rode a bicycle in the neighborhood where he knew Gomez' house was located. Defendant approached a group in Gomez' front yard and asked about a black Volkswagen which was in the driveway. Gomez's son, Carlos Gomez, befriended defendant and they often socialized together thereafter. [Defendant and members of the Gomez family were friendly for about three months before the kidnapping.]

Dogo called defendant that fall and told him that Gomez had cocaine which belonged to Dogo. He directed defendant to recover either the cocaine or $150,000, the value of the missing drugs. Either Dogo or defendant hired Manuel Salais and "Cholin"[5] to assist in this task. Two attempts to obtain the drugs or money from Gomez were thwarted when defendant and his

---

[4]    The record occasionally references him as "Dago." We have retained the spelling "Dogo" throughout this opinion, without indicating the alteration, for consistency and clarity.
[5]    "Cholin's" true identity was never established. Therefore, we adopt the name used by defendant.

cohorts encountered too many family members present at the Gomez home.  Defendant then spent three to four days in a hotel with Salais waiting for another opportunity to retrieve the drugs or money from Gomez.

On October 15, 1986, defendant, Salais, and Cholin met at an automobile detail shop, and traveled from there to the home of Gomez and Mrs. Gomez, purportedly to finalize the sale of the Volkswagen automobile to defendant.  They drove there in a Ford Granada that defendant had purchased for Dogo, using a false name. Gomez let the three men into the house [when they arrived at about 8:00 or 8:30 a.m.].  Defendant was the last to enter. Mrs. Gomez was in the laundry area when Salais entered the room. [Salais grabbed her by the throat and] put a gun to her head while Cholin bound her hands and feet with duct tape.  She was scared. Mrs. Gomez was laid on the floor of the family room next to her granddaughter's crib[; the child was in the crib at the time].  Defendant did not look surprised when he saw one of his companions with a gun.  Mrs. Gomez saw defendant and Salais lead her husband past her into a back bedroom which he used as an office.  She was unable to see or hear what occurred in that room.  During this time, however, she heard her husband say that he did not have either the drugs or the money being demanded of him.  Cholin remained in the room with Mrs. Gomez, watching out the window.

Defendant and Salais returned Gomez to the family room, his hands and mouth taped.  [Gomez was wearing shorts when he went into the office, and he was dressed in different clothing when he emerged.]  Defendant was carrying a bag containing cocaine found in the crawl space below the bedroom closet, together with money, jewelry and a black book removed from a

4

safe which Gomez had opened for them. Defendant directed one of his companions to get the car and open the trunk. While on the floor next to his wife, Gomez asked "What will I do?" and mentioned the name "Dogo." [ ] Mrs. Gomez thought "Dogo" was a friend of her husband. Three days before, Gomez had told her that he was holding money for "Dogo."

Defendant directed one of the men to put Gomez in the trunk of the Ford in which defendant, Salais and Cholin had driven to the Gomez residence. Mrs. Gomez asked defendant not to put her husband in the car [in the trunk, because he would asphyxiate]. Defendant told her that they would harm the family if she told the police. Defendant also told Mrs. Gomez that her husband might not be back. [Mrs. Gomez testified that defendant "said that the surest thing is that [Gomez] would not return."] When she asked him if he was a policeman, he replied that he was from the Mafia. Defendant issued orders to Salais and Cholin while they were in the house.

Salais and Cholin put Gomez into the trunk of the Ford. Defendant made no effort to deter them from doing so. Defendant, Salais, and Cholin then drove to the automobile detail shop where the three had met before going to Gomez' home. They arrived at the shop between 11:00 in the morning and noon. Gomez was given water, and then taken to a house owned by a friend of Dogo. There Gomez was taken out of the car and given more water. Salais kept his gun on Gomez while Dogo talked to him about a shipment of cocaine.[6] Defendant testified he was standing 10 to 12 feet away, smoking some of the crack cocaine

---

6    The trial transcript does not make clear how long Dogo had been in the local area.

taken from the crawl space beneath Gomez' home, and that he heard only part of the conversation between the two men.

Defendant also testified that, at Dogo's direction, he brought some writing paper; that Gomez wrote something on the paper which Dogo took and folded; and that defendant did not look at the paper at any time. Dogo instructed defendant to deliver the note to Mrs. Gomez.

In the meantime, Mrs. Gomez had freed herself and called her son Carlos. She believed that the money taken from the safe belonged to Dogo. Later that day, Mrs. Gomez received a telephone call from defendant. He directed her to go to the public telephones at the intersection of Orr and Day, and Telegraph ("the corner").

Dogo drove defendant and Cholin to the detail shop where they picked up Cholin's car. They then drove to the corner to deliver the note. Mrs. Gomez went to the corner, but was unable to find a note. Defendant met her and handed her a folded note. He said that she should not worry. Mrs. Gomez returned home [at around 3:00 p.m.] and read the note, which was in Spanish in her husband's handwriting. It instructed her to tell their children that he had gone on a trip, not to worry, that he was all right; to go to the bank and take the money and everything they had and give it to defendant and the others. [A detective at trial characterized this as a ransom note.] By that time, the banks were closed, so Mrs. Gomez went the next day. She closed out two bank accounts and emptied a safe deposit box, accumulating over $51,000. Neither defendant nor Dogo ever contacted Mrs. Gomez about her husband again.

After delivering the note to Mrs. Gomez, defendant and Cholin did not return to the house where Gomez was being held.

Instead, they drove around for a time, drank some beers, then checked into a hotel. Dogo was staying at the same hotel. They remained at the hotel until 8 or 9 a.m. the next morning, October 16, 1986. Defendant and Cholin then went to the detail shop and met Salais and Dogo [when they arrived around noon]. Salais gave defendant the keys to the Ford and said: "Here, man. Mario is dead. He is in the trunk of your car."

Defendant fled to Florida, driving a station wagon belonging to Dogo. He delivered that vehicle to an auto shop owned by Dogo in Florida.

Gomez' body was found in the trunk of the Ford on November 4, 1986. His knees and wrists were bound with cord[, small pieces of gray duct tape were in the trunk, and there was bruising on Gomez's head]. The cause of death was asphyxia (lack of oxygen) consistent with suffocation from confinement in a small place. There were no signs of strangulation. [The forensic pathologist testified that she was unable to exclude the possibility that asphyxia was caused by carbon monoxide in the trunk.] Due to the extreme decomposition of the body, the forensic pathologist was unable to determine when or where Gomez died. She concluded that it was possible that he died on October 15 or 16. Salais' fingerprint was on a beer bottle found in the car with Gomez' body. Defendant's fingerprints were on the note delivered to Mrs. Gomez.

Defendant stayed with Donna Henshaw until November 18, 1986, and then traveled to Ecuador where his family was located. Henshaw testified that defendant told her that he had hired Salais and Cholin to help him get the money or drugs from Gomez. Defendant also admitted to Henshaw that he was in charge and gave orders to the others inside the house. Defendant

7

did not make any admissions about orders to kill Gomez or how he died. [Defendant had Henshaw call California to inquire about whether Gomez's body had been found.] While in South America, defendant spent three days with Dogo in Colombia. He admitted that he made the trip to Colombia to collect money and the title to several automobiles promised by Dogo. They had an argument, and defendant returned to the United States. He was arrested in Florida.

At trial, defendant testified on his own behalf. He admitted participating in the events at the Gomez house, and delivering the note to Mrs. Gomez. According to defendant, Salais was in charge while they were at the house. Defendant testified that he did not know Salais had a gun when they went to the Gomez house on October 15th. When Salais pulled the gun, defendant was terrified and went along out of fear for his life.

He denied knowledge of the contents of the note, that Dogo was holding Gomez for ransom, or that force would be used on Gomez. "When we went into the house," he later testified, "I thought that things were going to be friendly. I thought that they are going to ask him, 'Hey, give me the coke.' And that's that. I never thought anything about guns or I never thought anything about violence. I never thought nothing, never had any idea that this is going to end up like it end up [*sic*]." On cross-examination, defendant admitted that when Dogo told him to take Salais and Cholin to the Gomez house, his thinking was that it "sounds logical for me to take two persons with me to put some pressure with Mario because if I go by myself and Mario beat me up and kick me out of the house easily." He admitted that he believed it was possible that he would have to put pressure on Gomez. He was not present when Gomez died.

Defendant testified that before writing the note, Gomez had a "friendly" conversation about cocaine with Dogo. Defendant had been smoking some of the cocaine taken from Gomez, and was unable to hear all of the conversation from his position. He did hear Gomez tell Dogo that he would pay $50,000 immediately and an additional $100,000 when he sold some property. Defendant admitted that he told Donna Henshaw: "[W]hat happened here . . . we took a guy out of his house and the guy ends up dead."

Defendant testified that he told Dogo he "[didn't] want anymore to do with this," that he "[didn't] like this" and that they "should not take the guy out of the house." He testified that Dogo told him that delivering the note was the "last thing" he had to do and that they were going to let Gomez go. On cross-examination, defendant admitted that he never tried to get away from Salais or Cholin between the entry of the Gomez house and his departure to Florida. He voluntarily stayed with Cholin in the same hotel used by Dogo on October 15, although Cholin did not have a gun. Defendant admitted that he voluntarily delivered a car to Florida for Dogo and visited him in Columbia [*sic*] after learning of Gomez's death. Finally, he admitted that he never told Mrs. Gomez where her husband was being held and that he never went to the police. (*Ordonez, supra,* 226 Cal.App.3d at pp. 1217-1221.)

2. *Verdict and sentence*

At trial, "[t]he jury was instructed on premeditated murder (CALJIC No. 8.20); first degree felony murder in pursuance of a conspiracy (CALJIC No. 8.26); first degree felony murder as an aider and abettor (CALJIC No. 8.27); unpremeditated (second degree) murder (CALJIC No. 8.30); second degree murder arising

9

from an act dangerous to life (CALJIC No. 8.31); second degree felony murder committed during the commission of aggravated kidnapping (CALJIC No. 8.32); and second degree felony murder in pursuance of a conspiracy to commit kidnapping (CALJIC No. 8.33). [¶] The jury returned general verdicts finding defendant guilty of aggravated kidnapping (§ 209, subd. (a)) and first degree murder." (*Ordonez, supra,* 226 Cal.App.3d at p. 1222.) Ordonez moved for a new trial on the basis that the jury had been erroneously instructed as to first degree murder. "The trial court agreed that the first degree felony murder instruction was erroneous, but concluded that a conviction of murder in the second degree was proper. The court reduced the first degree murder conviction to second degree murder." (*Ibid.*)

The trial court sentenced Ordonez to a term of life without possibility of parole on the aggravated kidnapping conviction, and a concurrent term of 15 years to life on the murder conviction.

3. *Appeal from judgment*

In Ordonez's appeal from the judgment, this court modified the judgment and affirmed the conviction. We found the trial court's reduction of the murder conviction to be appropriate. Discussing *People v. Patterson* (1989) 49 Cal.3d 615, we noted that "[s]econd degree murder may be committed by a deliberate killing, with malice but without premeditation, or by a killing in the course of a felony inherently dangerous to human life." (*Ordonez, supra*, 226 Cal.App.3d at p. 1223.) We continued, "'[F]or purposes of the second degree felony-murder doctrine, an "inherently dangerous felony" is an offense carrying "a high probability" that death will result.' (*People v. Patterson, supra*, 49 Cal.3d at p. 627.) . . . . [¶] We have no doubt that kidnapping for ransom, extortion or reward satisfies the *Patterson* standard."

10

(*Ordonez, supra*, 226 Cal.App.3d at p. 1225.)  We added that "courts have consistently held that even simple kidnapping presents an inherent danger to human life" (*id*. at pp. 1227-1228), and concluded that "aggravated kidnapping for ransom, extortion or reward (§ 209, subd. (a)) is an offense carrying 'a high probability' that death will result.  It therefore is an offense inherently dangerous to human life, and supports a conviction for second degree felony murder."  (*Id*. at p. 1228.)

We also rejected Ordonez's argument that the trial court erred in instructing the jury on the elements of aggravated kidnapping because it did not define "extortion."  We stated, "In pertinent part, section 209, subdivision (a) requires that a person be taken, carried away, or held 'for ransom, reward or to commit extortion or to exact from another person any money or valuable thing, or any person who aids or abets any such act, is guilty of a felony. . . .'  The court instructed the jury in the language of CALJIC No. 9.22, defining aggravated kidnapping, which tracks the statutory language."  (*Ordonez, supra*, 226 Cal.App.3d at p. 1229.)  We stated that although the kidnapping here was for ransom rather than extortion, "the import of the term 'extortion' in this case could not have been misunderstood.  It was that Mrs. Gomez was to turn over money to defendant and his cohorts or Mr. Gomez would be harmed.  The failure to define extortion in this context was harmless."  (*Id*. at p. 1230.)

After addressing additional issues not relevant here, we found that the judgment must be modified under section 654:  "In this case, defendant committed a kidnap for ransom during which the victim was killed.  His conduct as a participant in the aggravated kidnapping and in the second degree murder are indistinguishable, and he cannot be punished for both crimes.

11

We therefore modify the abstract of judgment by staying the sentence for second degree murder pending completion of the term of life imprisonment without possibility of parole imposed for kidnapping under section 209, subdivision (a)." (*Ordonez, supra*, 226 Cal.App.3d at pp. 1239-1240.)

## B.  Ordonez's petition for resentencing

In January 2019, Ordonez filed a petition for resentencing under section 1172.6.  On the form petition, he checked the box stating that he had been convicted of second degree murder under the natural and probable consequences doctrine, and could not now be convicted of murder because of changes to section 188. The court appointed Ordonez's original trial counsel to represent him.  The People filed an opposition, asserting that Ordonez was not eligible for resentencing under section 1172.6 because he had been a major participant in the underlying felony resulting in death, and he acted with reckless indifference to human life under section 189, subdivision (e)(3).

Ordonez filed a reply, a supplemental reply, and a supplemental memo of points and authorities.  The trial court issued an order to show cause and set an evidentiary hearing.

At the evidentiary hearing on June 11, 2021, the court stated that it had reviewed the petition, opposition, reply papers, and the record of conviction.  The court stated that it was "going to utilize the *Banks* [and] *Clark* analysis in determining whether or not Mr. Ordonez is entitled to the relief sought," referring to *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), which provided guidance on the meaning of "major participant" and "reckless indifference to human life."

The prosecutor requested that the court rely on the record of conviction and the Court of Appeal opinion, which stated that Ordonez was the "mastermind" or "point person" for the kidnapping for ransom resulting in death. Ordonez was sworn and testified that Dogo, "the boss," asked Ordonez to retrieve from Gomez some drugs and money belonging to Dogo. Ordonez stated that he and his accomplices entered Gomez's home but could not find the drugs and money, so they took Gomez "so he can talk to Dogo and clear this issue up." Cholin put Gomez in the trunk, and took him to a car detail shop and then to "Dogo's friend's house." Dogo arrived, and he and Gomez had "a friendly conversation." Ordonez said that when he left the location to deliver a note to Mrs. Gomez, he did not believe that Gomez would be hurt or killed because he was "indispensable" to the drug running operation. He did not go back to the house, and learned the next day that Gomez was dead.

On cross-examination, Ordonez agreed that he befriended Gomez's son a few months prior to the kidnapping. Ordonez testified that he never told Mrs. Gomez that her husband would not be coming back, and denied threatening her.

The court stated that it was viewing "with a little skepticism" Ordonez's testimony that the interaction with Gomez was "friendly," given that Dogo wanted drugs or money back from Gomez, and Ordonez and the others had tied Gomez up and placed him in the trunk of a car. The court stated that Ordonez "certainly set in motion the chain of events which would ultimately result in the death of Mr. Gomez," including purchasing the car used in the kidnapping and in which Gomez's body was eventually found, and using a false name "to help cover the tracks in the event something goes south." The court also

13

noted Mrs. Gomez's testimony that Ordonez told her that that she might not see Gomez again, which "infers that he not only was a major participant, [but also] that he's acting with reckless indifference to life. I think second-degree felony murder is an appropriate conviction . . . ." The court noted that the resentencing petition was "almost an exercise in futility" anyway, because the life sentence on the kidnapping charge would not change.

The court therefore denied the petition for resentencing. Ordonez timely appealed.

## DISCUSSION

Ordonez contends the trial court's ruling was not supported by substantial evidence. At a hearing to determine whether a petitioner is entitled to resentencing under section 1172.6, "the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder . . . under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (d)(3).) We review a trial court's determination following a section 1172.6, subdivision (d) hearing for substantial evidence. (*People v. Garrison* (2021) 73 Cal.App.5th 735, 747.)

Resentencing is unavailable if the petitioner was a major participant in the underlying felony and acted with reckless indifference to human life. (*People v. Strong* (2022) 13 Cal.5th 698, 710 (*Strong*).) Ordonez asserts the evidence does not support findings that he was a major participant or that he acted with reckless indifference to human life. We reject both contentions.

14

## A. Major participant

In *Banks, supra,* 61 Cal.4th 788, the Supreme Court provided guidance on the circumstances under which "'an accomplice who lacks the intent to kill may qualify as a major participant'" for purposes of the felony-murder special circumstance. (*Strong, supra,* 13 Cal.5th at p. 705, quoting *Banks, supra,* 61 Cal.4th at p. 794.) The court set out a nonexhaustive list of considerations relevant to "determining the ultimate question, whether the defendant's participation 'in criminal activities known to carry a grave risk of death' [citation] was sufficiently significant to be considered 'major'": "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death?[ ] What did the defendant do after lethal force was used? No one of these considerations is necessary, nor is any one of them necessarily sufficient." (*Banks, supra,* 61 Cal.4th at p. 803.)

Ordonez asserts he was not a major participant in the crimes leading to Gomez's death. He acknowledges the evidence shows that he "engaged in significant planning to befriend Gomez and his family" in preparation for a "home invasion," but he contends this is not evidence that he planned to kidnap or murder Gomez. He also argues that he was not armed during the

15

incident and there was no evidence that he supplied the gun to Salais.

Substantial evidence supports the trial court's finding that Ordonez was a major participant, because Ordonez engaged in significant planning and execution of the criminal enterprise that resulted in Gomez's death. Ordonez spent months ingratiating himself with the family under false pretenses, and he and his accomplices waited for days to enter the home until an opportune time arose. While inside the home, Ordonez gave orders to the others, went to the office to steal money or drugs while Mrs. Gomez was bound with duct tape, ordered Gomez to be placed in the trunk of the car despite Mrs. Gomez's protest that Gomez could asphyxiate, and told Mrs. Gomez that Gomez would not be back. Once Gomez had been removed from the home, Ordonez continued to perpetuate the crime by driving Gomez to the detailing shop and then to a home, and by calling Mrs. Gomez and delivering the ransom note to her later that afternoon.

*Banks* states that a defendant's *inaction* is also relevant. (*Banks, supra*, 61 Cal.4th at p. 803.) Here, the crime spanned more than a day—Ordonez and his associates entered the Gomez home at about 8:30 a.m.; Ordonez delivered the ransom note to Mrs. Gomez shortly before 3:00 p.m. the same day; and Ordonez learned around noon the following day that Gomez was dead. During this time, Ordonez did nothing to interrupt the chain of events. "A defendant is more culpable when he does nothing to avoid violence despite having time to reflect and consider his options." (*In re McDowell* (2020) 55 Cal.App.5th 999, 1014.)

In light of Ordonez's extensive planning, his active role in the home invasion, and his continued active role in the kidnapping for ransom, substantial evidence supports the trial

court's finding that he was a major participant in the criminal enterprise that resulted in Gomez's death.

## B.     Reckless indifference to human life

Ordonez further asserts that the evidence does not support a finding that he acted with reckless indifference to human life. To determine whether a participant acted with reckless indifference to human life, a court considers "a nonexhaustive list of considerations . . ., including use of or awareness of the presence of a weapon or weapons, physical presence at the scene and opportunity to restrain confederates or aid victims, the duration of the crime, knowledge of any threat the confederates might represent, and efforts taken to minimize risks." (*Strong, supra*, 13 Cal.5th at p. 706, citing *Clark, supra*, 63 Cal.4th at pp. 618-623.)  The major participant and reckless indifference factors "significantly overlap" in that "'the greater the defendant's participation in the felony murder, the more likely that he acted with reckless indifference to human life.'" (*Clark, supra*, 63 Cal.4th at pp. 614-615, quoting *Tison v. Arizona* (1987) 481 U.S. 137, 153.)

Again the trial court's conclusion was supported by substantial evidence.  As the Supreme Court stated in *Clark*, "Where a victim is held at gunpoint, kidnapped, or otherwise restrained in the presence of perpetrators for prolonged periods, 'there is a greater window of opportunity for violence' [citation], possibly culminating in murder.  The duration of the interaction between victims and perpetrators is therefore one consideration in assessing whether a defendant was recklessly indifferent to human life." (*Clark, supra*, 63 Cal.4th at p. 620.)

We held in Ordonez's initial appeal that "aggravated kidnapping for ransom, extortion or reward (§ 209, subd. (a)) is

an offense carrying 'a high probability' that death will result," and is "an offense inherently dangerous to human life." (*Ordonez, supra*, 226 Cal.App.3d at p. 1228.) We observed, "'[K]idnapping for ransom inherently presents a combination of factors creating a substantial risk of bodily harm. In the ransom situation, "forcible control is necessary to effect secret confinement; the offense requires a protracted concealment; the confinement becomes more difficult to maintain when the kidnapper's flight ultimately becomes necessary; and the victim's release grows increasingly dangerous with the passage of time." Accordingly, a demand for ransom generally involves an express or an implied threat of death or great bodily harm.'" (*Id*. at p. 1228.) These factors were all present here: After Ordonez befriended the family and planned the home invasion, over the course of more than 24 hours Gomez was bound; taken forcibly from his home; placed in the trunk of the car; taken to a location to meet with Dogo, who was attempting to get money or drugs from Gomez; and eventually died of asphyxiation while bound in the trunk of the car.

Ordonez argues his participation does not meet the *Clark* factors because he was not present at the time of Gomez's death, and there was no evidence "to show that any accomplice disclosed or even hinted at an intention to kill Gomez before he actually did so in [Ordonez's] absence." However, the evidence shows that Ordonez himself suggested an intention to kill Gomez when he told Mrs. Gomez that Gomez would not return. In addition, Mrs. Gomez asked Ordonez not to place Gomez in the trunk because he could asphyxiate, and Ordonez and his accomplices did so nonetheless. Moreover, "physical presence is not invariably a prerequisite to demonstrating reckless indifference to human

18

life." (*Clark, supra*, 63 Cal.4th at p. 619.) Ordonez gave orders to the others while in the Gomez home and he continued to participate in the aggravated kidnapping when he called Mrs. Gomez and delivered the ransom note to her. "[A] defendant who plans and directs a murder from afar may be just as culpable as a defendant who is physically present at the scene of the crime." (*In re Scoggins* (2020) 9 Cal.5th 667, 679; see also *People v. Williams* (2015) 61 Cal.4th 1244, 1281-1282 [evidence that the defendant was a "founder, ringleader and mastermind" who directed others to commit crimes was "more than sufficient to uphold the special circumstance finding that defendant was a major participant and acted with reckless indifference to human life," even if he was not present at the time certain crimes were committed].)

Ordonez further asserts the *Clark* factors have not been met because there was no evidence that he knew Salais would be armed, or that any of his accomplices had a propensity for violence. Even assuming this were true, the initial kidnapping occurred while Ordonez and his accomplices were, by Ordonez's own admission, in the process of carrying out a home invasion robbery of someone involved in the drug trade—"a crime with a particularly high risk of violence." (*In re McDowell* (2020) 55 Cal.App.5th 999, 1013 [armed home invasion robbery of a drug dealer posed obvious risk of lethal violence evidencing reckless indifference to human life].) Moreover, Ordonez continued participating in the crime for hours after Salais revealed the gun, driving with his accomplices and Gomez from one place to another, delivering the ransom note to Mrs. Gomez that afternoon, and returning to Salais and the detail shop the following day. Thus, even if Ordonez initially did not know

19

Salais was armed, he nevertheless continued participating in the crime long after becoming aware of this fact, and did nothing to protect Gomez from the use of lethal force.

Substantial evidence therefore also supports the trial court's finding that Ordonez acted with reckless indifference to human life. He was ineligible for resentencing under section 1172.6, and the petition was correctly denied.

## DISPOSITION

The order denying Ordonez's petition for resentencing is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.


We concur:


MANELLA, P. J.


CURREY, J.