Filed 3/25/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B322561 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA050222) |
| v. | |
| BRIAN TERRELL HILL et al., | |
| Defendants and Appellants. | |

APPEALS from postjudgment orders of the Superior Court of Los Angeles County. Victor D. Martinez and Juan Carlos Dominguez, Judges. Affirmed.

Steven A. Brody, under appointment by the Court of Appeal, for Defendant and Appellant Brian Terrell Hill.

Allen G. Weinberg, under appointment by the Court of Appeal, for Defendant and Appellant Clifford Jenkins.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Steven D. Matthews and Amanda V. Lopez, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Brian Terrell Hill and Clifford Jenkins appeal the denial of their petitions for resentencing under Penal Code[1] section 1172.6 (former § 1170.95).[2]  Appellants contend the denial of their petitions in reliance on a theory of felony murder based on kidnapping violates ex post facto principles because, at the time of the offense, kidnapping was not an enumerated felony under section 189, subdivision (a) to which felony-murder liability could attach.  In the event this court concludes appellants may be guilty under a theory of felony murder based on robbery, appellant Jenkins asserts that remand is required to allow the superior court to conduct a new evidentiary hearing at which the People must prove appellants guilty beyond a reasonable doubt of felony murder based on robbery.[3]  Appellants further contend that substantial evidence does not support the superior courts' findings.  We reject appellants' contentions and affirm the denial of their petitions under section 1172.6.

---

[1] Undesignated statutory references are to the Penal Code.

[2] Effective June 30, 2022, Penal Code section 1170.95 was renumbered section 1172.6, with no change in text.  (Stats. 2022, ch. 58, § 10.)

[3] Because we decide that the superior court properly denied appellant Jenkins's petition on the ground that he could be convicted of felony murder on the basis of the kidnappings, we do not address this claim.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *The murder of Randy Burge and attempted murder of Kevin Thomas*[4]

On February 22, 1990, approximately 2:00 in the afternoon, Kevin Thomas was stopped in traffic in his car on 67th Street between Kansas Street and Vermont Avenue in Los Angeles, when Ernest Simms approached on foot. Placing a .25- or .32-caliber revolver against the back of Thomas's head, Simms ordered Thomas out of the car. Simms forced Thomas at gunpoint to walk up a driveway to the back of a house where Jenkins was waiting at the back door. Jenkins was also armed with a .25- or .32-caliber revolver.

Putting his gun to the back of Thomas's head, Jenkins forced Thomas through the kitchen into the living room of the house, where he made Thomas lie down on the floor. While Simms stood over Thomas with his gun trained on his head, Jenkins put his knee in Thomas's back, handcuffed him, and placed duct tape over his mouth. As he restrained Thomas, Jenkins said, " 'This is for when I seen you the other day and you pointed your finger at me.' "

Jenkins then left the house and returned with Randy Burge. Burge held his hands up as Jenkins forced him into the living room with his gun pressed into Burge's back. Simms said to Burge, who had been standing on the street corner when Thomas was abducted, " '[Y]ou at the wrong place at the wrong time.' " Burge was forced to the floor, and as Jenkins stood over Burge pointing his gun at him, Simms put Burge in handcuffs,

---

[4] The following statement of facts is drawn from the record of appellants' trial.

3

tied his ankles, and stuffed a white T-shirt or cloth into Burge's mouth. The T-shirt was replaced with duct tape, but the T-shirt was later put back in Burge's mouth.

After Burge had been brought into the house, Freddie Doss entered, followed shortly thereafter by appellant Hill. Hill was armed with a .25- or .32-caliber revolver, and Doss had a slightly larger gun—a .38-caliber revolver. When Hill saw Thomas on the couch in handcuffs, he said to Thomas, " 'Yeah, we got you.' " Pointing his gun at Thomas and Burge, Hill repeatedly told them "to keep the noise down."

Burge kept making noise and asking why they were doing this to him. Simms responded, " 'Shut up, man, I'm not playing.' " When Burge persisted, Simms shot him in the foot.

At some point, Simms demanded $10,000 from Thomas. With their guns on Thomas's head, Simms and Jenkins put the phone to Thomas's ear and made him call his mother for the money. They told Thomas to say "a girl" would come over to pick up the money. Jenkins wrote down Ms. Thomas's address. Later Jenkins took Thomas's keys, $30 in cash, and a ring from Thomas's finger. Thomas's handcuffs and the tape had been removed to allow Thomas to call his mother. After the call, Jenkins replaced both.

About an hour and a half to two hours into the kidnapping, and about 10 to 15 minutes after the ransom call, Jenkins and Simms left the house. Hill and Doss remained guarding Thomas and Burge with their guns. The tape was removed and the victims were given beer and cigarettes, but when they asked why this was happening, Hill and Doss just told them to " 'shut up.' "

Around 5:00 p.m., Lucille Thomas received a phone call from her son. He said, " 'A girl named Donna is coming by to pick

4

up $10,000.  Give it, give it to her.' "  Then the line went dead.
Ms. Thomas was able to pull together the $10,000, and about 45
minutes after the phone call, a woman calling herself Donna
came to the door demanding the money.  Ms. Thomas gave Donna
the money and saw her walk across the street toward a purple
van Ms. Thomas had never seen before.

Jenkins and Simms returned to the house about an hour
and a half to two hours after they had left.  Thomas asked if they
had collected the money from his mother.  Simms told Thomas
his mother was not home and said, " 'No, we didn't get [the
money] and your mama don't care about you.' "  Apparently
looking for a specific key, Jenkins took Thomas's sock off.  Then
Jenkins and Simms left the house again, leaving Hill and Doss to
stand guard with guns pointed at the captives.

After being held for about five hours, Thomas came to
believe that he had to escape or he would be killed.  Still
handcuffed, he bolted from the couch and threw himself through
a closed glass window, landing on his back in the driveway about
five feet below the window.  The handcuffs broke apart on impact.
He got up and began running as Hill and Doss came out of the
house.  Hill and Doss pursued Thomas, firing five to six shots at
Thomas.  Thomas first sought safety in nearby apartments, but
no one would let him in.  Finally, approximately 8:00 p.m. he ran
into a liquor store at 67th and Vermont, and one of the employees
called the police.

When the police arrived, Thomas told them what had
happened, and the officers took Thomas back to the location
where he had been held.  Around 9:50 p.m., as the police car
turned the corner just past the house, the officers and Thomas
saw a burgundy or purple van.  Thomas spotted Jenkins and

5

Simms in the van and alerted the police. As the police siren was activated, the van sped away and pulled into a driveway. Jenkins and Simms exited the vehicle and fled on foot. Simms was apprehended a short time later, and Jenkins was found hiding in the residence of Simms's mother. Police recovered two handcuff keys from a toilet bowl where Jenkins was apprehended.

Hill, Doss, and Burge were gone when Thomas and police officers entered the house where the victims had been held.

Around 9:00 p.m. on February 22, 1990, a witness heard a single gunshot coming from the playground area of Centinela Park in Inglewood, approximately 3.9 miles from the house where Burge and Thomas had been held. The next morning around 6:35 a.m., a jogger discovered a body in Centinela Park. Police arrived to find Burge's body facedown in the park, his hands handcuffed behind his back. He had a white T-shirt rolled up in his mouth as a gag and tied behind his neck. He had two visible gunshot wounds: a bullet wound behind his right ear, and a bullet hole in the top of his right shoe. There was a pool of blood around the head on the ground, and blood coming out of the ears, mouth, and nose. The condition of the body and pool of blood at the head suggested Burge had been killed at the site where he was found.

The autopsy revealed that Burge had died from a single gunshot wound to the head, fired from a .38-caliber revolver in contact with the skin. Time of death was estimated between 8:00 and 9:00 p.m. on February 22, 1990. The gunshot wound to the foot had come from a .22-caliber handgun.

## B. *Conviction and sentencing*

On November 17, 1992, a jury convicted appellants as charged of the first degree murder of Burge (§ 187, subd. (a);

count 1), and the attempted willful, deliberate, and premeditated murder of Thomas (§§ 664/187, subd. (a); count 6).[5]

At sentencing, the trial court struck the special circumstance findings as to appellant Hill, and sentenced both appellants to a term of 25 years to life for the first degree murder of Burge (count 1), plus a consecutive term of four years for the personal gun use enhancement on count 1. The court further imposed a subordinate consecutive term of life with parole for the attempted murder of Thomas (count 6).[6]

This court affirmed the judgment in an unpublished opinion in case number B074209, filed January 11, 1996. (*People v. Clifford Jenkins et al.* (Jan. 11, 1996, B074209) [nonpub. opn.].)

---

[5] The jury also convicted appellants as charged of the kidnapping of Burge for robbery (§ 209, subd. (b); count 2), the kidnapping of Thomas for ransom (§ 209, subd. (a); count 3), conspiracy to commit the crime of kidnapping for ransom (§§ 182/209, subd. (a); count 4), and the robbery of Thomas (§ 211, subd. (a); count 5). The jury found the personal use of a firearm enhancement true as to both appellants on counts 1 through 6. (§ 12022.5, subd. (a).) In addition, as to appellant Hill, the jury found the special circumstance true that he committed the murder during the commission of a robbery and a kidnapping. (§ 190.2, subd. (a)(17).) In bifurcated proceedings, the trial court found appellant Jenkins guilty of possession of a firearm by a convicted felon (former § 12021.1; count 11), and also found three alleged prison priors true.

[6] The trial court stayed the sentences on the remaining counts and struck the personal gun use enhancements for purposes of sentencing on counts 2 through 6. Appellant Jenkins was sentenced to an additional concurrent term of two years for the felon in possession charge (count 11).

### C. The Section 1172.6 Proceedings

In March and August 2019, respectively, appellants Hill and Jenkins filed petitions for resentencing pursuant to section 1172.6. Both petitions were denied for failure to make a prima facie showing for relief. Both appellants appealed. In each case, this court reversed the order denying the petition and remanded the matter with directions to issue orders to show cause and further proceedings in accordance with section 1172.6, subdivision (d). (*People v. Ernest Simms et al.* (July 2, 2021, B304577) [nonpub. opn.]; *People v. Clifford Jenkins* (Feb. 4, 2022, B312226) [nonpub. opn.].)

Following remand, orders to show cause issued, and appellants' section 1172.6 petitions came on for evidentiary hearing. The evidentiary hearings were conducted by two different superior court judges in separate proceedings.

*1. The evidentiary hearing on appellant Hill's petition*[7]

At the start of the evidentiary hearing, the superior court announced it had reviewed the abstract of judgment, the charging documents, the trial transcripts, jury instructions, verdict forms, and the procedural portions of the Court of Appeal opinion. The parties did not present any additional evidence, but relied on the trial record.

Following argument by the parties, the superior court found appellant Hill guilty beyond a reasonable doubt of the

---

[7] On January 7, 2022, appellant Hill filed a second section 1172.6 petition in which he sought resentencing on his conviction for attempted murder. At the evidentiary hearing, counsel for Hill argued for section 1172.6 relief as to both the murder and attempted murder convictions, and in denying the petition, the superior court addressed both.

8

attempted murder of Thomas. Declaring that malice "was very easily found," the court explained that "[f]iring a weapon directly at an individual, even if you miss him, clearly shows [the intent] to kill that person." The court further noted that Hill and Doss were attempting to kill Thomas because he was a potential witness.

Next, the superior court found Hill guilty beyond a reasonable doubt of the murder of Burge on two theories. First, the court determined that Hill was a direct aider and abettor in the killing who acted with malice. The court found that Hill assisted Doss in transporting Burge to the park and killing him. The court explained, "[T]he idea that Doss on his own, . . . bound and gagged this person [who had been] shot in the foot and took him to the park by himself and executed him by himself is not reasonable to this court." The court further found that Hill and Doss's attempt to kill Thomas established a willingness to kill to eliminate witnesses, and thus showed malice, planning, and deliberation in the killing of Burge. The court observed, even "if there's some argument that Hill didn't go, his participation throughout the entire incident . . . [makes] very clear that Hill was part of the whole planning of this." The court concluded that Hill "is not eligible for relief [under section 1172.6] because the People have proved beyond a reasonable doubt that [Hill] could be convicted of murder under the current state of the law, specifically the defendant was not the actual killer, but with intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested or assisted . . . the actual killer in committing the murder."

The superior court also found Hill guilty of murder beyond a reasonable doubt on a theory of felony murder based on the

9

kidnapping.  It specifically found Hill was a major participant in the kidnapping who acted with reckless indifference to human life.  The court explained that "Hill was an active participant in the kidnapping of the victims and involved in the planning and was present when the ransom call was made.  Doss and Hill held the two kidnapped individuals for more than five hours, and again was actively involved with his gun and in controlling the two individuals."  The court reiterated its finding that Hill had fired his gun at Thomas as Thomas tried to escape.

   2. *The evidentiary hearing on appellant Jenkins's petition*

   At the hearing on appellant Jenkins's petition, the parties submitted on the record of conviction, including the clerk's and reporter's transcripts, procedural portions of the prior appellate opinions, and all prior submissions by the parties.  No additional evidence or arguments were presented, and the superior court took the matter under submission.

   On July 13, 2022, the superior court issued a memorandum of decision denying the petition.  In it, the court noted it had previously taken judicial notice of the trial court's file and the appellate record in the case.  The court ruled Jenkins ineligible for section 1172.6 relief based on its finding, beyond a reasonable doubt, that Jenkins is guilty of felony murder under current law.  In support of its ruling, the court found that Jenkins "assumed a leadership role in the kidnapping of the two victims" and "was armed throughout the incident, pointing his gun at Thomas' head on two occasions."  The court also noted that it was Jenkins who put duct tape over Thomas's mouth, Jenkins who forced Thomas to call his mother for the ransom money and wrote down Thomas's home address, and Jenkins who robbed Thomas of his

ring and $30 cash. And after his arrest, Jenkins offered to pay Thomas $5,000 to recant his preliminary hearing testimony.

Based on these facts, the superior court found Jenkins's "actions during the incident" satisfied the requirements of both *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*). Jenkins was a " 'major participant in the incident who acted with reckless indifference to human life,' " and thus guilty of first degree murder and ineligible for resentencing.

## DISCUSSION

I. **Appellants Are Ineligible for Section 1172.6 Relief Based on a Kidnapping-Felony-Murder Theory that Is Valid Under Current Law**

A. *Section 1172.6*

Enacted in 2018 and effective January 1, 2019, the Legislature enacted Senate Bill No. 1437 " 'to amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' (Stats. 2018, ch. 1015, § 1, subd. (f).) In addition to substantively amending sections 188 and 189 of the Penal Code, Senate Bill [No.] 1437 added section [1172.6], which provides a procedure for convicted murderers who could not be convicted under the law as amended to retroactively seek relief." (*People v. Lewis* (2021) 11 Cal.5th 952, 959 (*Lewis*).) Effective January 1, 2022, Senate Bill No. 775 amended section 1172.6 to expand its coverage to individuals convicted of "attempted murder under the

11

natural and probable consequences doctrine." (§ 1172.6, subd. (a); *People v. Saibu* (2022) 81 Cal.App.5th 709, 747.)

Upon the filing of a facially sufficient resentencing petition under section 1172.6, the superior court must conduct a prima facie analysis with briefing to determine the petitioner's eligibility for relief, and, if the requisite prima facie showing is made, issue an order to show cause. (§ 1172.6, subd. (c); *People v. Wilson* (2023) 14 Cal.5th 839, 869; *People v. Nieber* (2022) 82 Cal.App.5th 458, 469–470.) At the evidentiary hearing following issuance of an order to show cause, the superior court acts as an independent fact finder, and the prosecution bears the burden of proving beyond a reasonable doubt that the petitioner is guilty of murder or attempted murder under California law following Senate Bill No. 1437's amendments. (§ 1172.6, subd. (d)(3); *Wilson*, at p. 869.) The petitioner and the prosecutor may offer new or additional evidence, and the court may consider evidence "previously admitted at any prior hearing or trial that is admissible under current law," including witness testimony. (§ 1172.6, subd. (d)(3); *Wilson*, at p. 869.)

On appeal from the denial of a section 1172.6 petition after an evidentiary hearing, we review the superior court's factual findings for substantial evidence and the court's application of the law to those facts de novo. (*People v. Wilson* (2023) 90 Cal.App.5th 903, 916.) In conducting our review, we consider the whole record in the light most favorable to the superior court's findings (*People v. Rivera* (2019) 7 Cal.5th 306, 323), and we presume " 'every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence.' " (*Id*. at p. 331.) We ask "whether substantial evidence, defined as reasonable and credible evidence of solid value, has been

disclosed, permitting the trier of fact to find guilt beyond a reasonable doubt." (*People v. Vargas* (2020) 9 Cal.5th 793, 820.) And based on this whole record review, we " 'determine whether *any* rational trier of fact could have found the essential elements of the crime . . . beyond a reasonable doubt.' " (*People v. Montanez* (2023) 91 Cal.App.5th 245, 270.) Finally, our Supreme Court has held that whether the prosecutor relied upon direct or circumstantial evidence, if the trier of fact's determination is supported, reversal is not warranted, even where " ' "the circumstances might also reasonably be reconciled with a contrary finding." ' " (*Vargas*, at p. 820, quoting *Rivera*, at p. 331.)

**B.** *The application of a kidnapping-felony-murder theory to appellants' section 1172.6 petitions did not violate ex post facto principles*

At the time of the kidnappings and murder on February 22, 1990, in this case, kidnapping was not an underlying felony for first degree felony murder liability. That changed in June 1990, when the voters approved Proposition 115, which amended section 189, subdivision (a) to add kidnapping as an enumerated offense on which a conviction for felony murder could be based. (*People v. Ordonez* (1991) 226 Cal.App.3d 1207, 1217, fn. 1.)

Section 189, subdivision (e) allows a conviction based on felony murder for a "participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) in which a death occurs" if the person was (1) the actual killer, (2) a direct aider and abettor who acted with the intent to kill, or (3) a major participant in the underlying felony who acted with reckless indifference to human life. (§ 189, subd. (e)(1)–(3).) Currently, section 189, subdivision (a) includes both kidnapping and robbery

13

among the offenses upon which a felony-murder conviction may be based.

Appellants contend that the denial of their section 1172.6 petitions in reliance on a theory of felony murder based on the kidnapping violates ex post facto principles because at the time of the offense, kidnapping was not an enumerated offense to which first degree felony-murder liability could attach. This argument fails.

Section 1172.6 does not fall into any of the four traditional categories of ex post facto laws established by the United States Supreme Court: (1) It does not impose punishment for an act which was not punishable at the time it was committed; (2) It does not aggravate a crime or make it greater than it was when committed; (3) It does not impose a greater punishment for a crime than when the crime was committed; and (4) It does not " 'alter[ ] the legal rules of evidence, [or] receive[ ] less, or different, testimony, than the law required at the time of the commission of the offence, in order to convict the offender.' " (*Stogner v. California* (2003) 539 U.S. 607, 612, italics omitted; *Weaver v. Graham* (1981) 450 U.S. 24, 28 ["The *ex post facto* prohibition forbids the Congress and the States to enact any law 'which imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed' "]; *People v. Gonzales* (2021) 65 Cal.App.5th 1167, 1172–1173.) Indeed, as our Supreme Court has observed, preventing unforeseeable punishment is "one of the primary purposes of the ex post facto clause." (*People v. Snook* (1997) 16 Cal.4th 1210, 1221.)

Section 1172.6 does not apply any new law retroactively to make formerly innocent conduct criminal. Rather, it looks to

14

whether a defendant could be convicted under current law despite the elimination of certain theories of murder that were available to the prosecution when the defendant was convicted before the enactment of Senate Bill No. 1437.  Accordingly, the denial of a section 1172.6 petition in reliance on a theory of felony murder based on current law does not implicate ex post facto principles.

Moreover, courts have uniformly held the sentence modification procedure under section 1172.6 to constitute an act of legislative lenity, not a new criminal prosecution.  (*Estrada v. Superior Court* (2023) 93 Cal.App.5th 915, 925 (*Estrada*) ["The retroactive relief provided by Penal Code section 1172.6 ' "is a legislative 'act of lenity' intended to give defendants serving otherwise final sentences the benefit of ameliorative changes to applicable criminal laws and does not result in a new trial or increased punishment" ' "]; *People v. Njoku* (2023) 95 Cal.App.5th 27, 45 (*Njoku*); *People v. Flint* (2022) 75 Cal.App.5th 607, 618; *People v. Myles* (2021) 69 Cal.App.5th 688, 704 (*Myles*); *People v. James* (2021) 63 Cal.App.5th 604, 610–611 (*James*); *People v. Hernandez* (2021) 60 Cal.App.5th 94, 111 (*Hernandez*).)

Resentencing under section 1172.6 is a completely voluntary process initiated by the petitioner, which cannot result in additional punishment.  (*Estrada, supra,* 93 Cal.App.5th at p. 925.)  It therefore does not implicate double jeopardy concerns, and there is no Sixth Amendment right to a jury.  (*People v. Duran* (2022) 84 Cal.App.5th 920, 931 [no right to jury or protection against double jeopardy]; *People v. Mitchell* (2022) 81 Cal.App.5th 575, 589 [same]; *Hernandez, supra,* 60 Cal.App.5th at p. 111 [double jeopardy concerns not implicated]; *James, supra,* 63 Cal.App.5th at p. 611 [no right to jury].)  Indeed, "[a]

15

petitioner under section 1172.6 does not possess many of the constitutional rights afforded to a criminal defendant at trial." (*Njoku, supra,* 95 Cal.App.5th at pp. 44–45; *Duran,* at p. 931 ["the panoply of rights that attach at trial do *not* apply during a section 1172.6 evidentiary hearing"]; *Mitchell,* at p. 588 ["Many constitutional protections that characterize burdensome criminal prosecutions thus do not apply in this ameliorative process"]; see *Lewis, supra,* 11 Cal.5th at p. 973 [right to counsel in § 1172.6 proceeding is statutory, not constitutional]; *Myles, supra,* 69 Cal.App.5th at p. 706 ["Because a sentence modification under section [1172.6] is an act of lenity and not a criminal trial, the wrongful admission of evidence does not implicate defendant's constitutional rights under the Fifth Amendment"].)

In *People v. Schell* (2022) 84 Cal.App.5th 437, the court held that "[i]nterpreting section 1172.6 to allow the prosecution to present different theories of guilt at the evidentiary hearing does not implicate constitutional concerns."[8] (*Id.* at p. 444.) The court explained, "As the People aptly put it, '[B]ecause a section [1172.6] evidentiary hearing does not subject a defendant to the risk of additional punishment, is not a trial, permits both parties to present new evidence, and merely considers whether the defendant's request for leniency meets the necessary criteria, there is no constitutional problem in allowing new theories of murder liability at that hearing.' " (*Id.* at pp. 444–445; see also

---

[8] The *Schell* court's interpretation remains subject to validation by our Supreme Court, which has stated, "[W]e express no view on whether a court may deny a section 1172.6 resentencing petition based on a theory of murder not argued by the prosecution at trial." (*People v. Reyes* (2023) 14 Cal.5th 981, 987.)

16

*People v. Gonzales*, *supra*, 65 Cal.App.5th at p. 1174 ["when a murder conviction is vacated under section [1172.6], it does not violate ex post facto or due process principles for the court to retroactively apply a sentencing provision that is supported by the record of conviction when resentencing the defendant, as long as the new sentence is no more severe than the punishment assigned by law when the act to be punished occurred, and is not greater than the defendant's original sentence"].)

In *Hernandez*, the defendant was charged and convicted by jury of felony murder based on the 1988 killing of a police officer during a commercial burglary. (*Hernandez, supra,* 60 Cal.App.5th at pp. 100, 101–102.) Although the trial court had instructed only on a theory of first degree felony murder, the court did not require the jury to make a finding on the degree of the murder. (*Id.* at pp. 101–102.) The trial court sentenced defendant to 25 years to life on the first degree felony-murder conviction. (*Id.* at p. 102.) But because the verdict form did not specify the degree of felony murder, on appeal from the judgment the appellate court modified the sentence to second degree murder under section 1157, and defendant was resentenced to a term of 15 years to life for the second degree murder. (*Ibid.*)

Following an evidentiary hearing on Hernandez's section 1172.6 resentencing petition, the superior court applied current law and ruled that Hernandez was ineligible for relief because he could still be convicted of first degree murder under section 189, subdivision (f). (*Hernandez, supra,* 60 Cal.App.5th at p. 104.) On appeal from the denial of his petition, Hernandez argued:

(1) Because the appellate court had ruled Hernandez's conviction was for second degree murder, he could not now be

17

tried or convicted of first degree murder. (*Hernandez, supra,* 60 Cal.App.5th at p. 109.)

(2) Because second degree felony murder has been eliminated, and section 189, subdivisions (e) and (f) do not apply to his conviction, Hernandez was entitled to relief under section 1172.6. (*Hernandez, supra,* 60 Cal.App.5th at p. 110.)

The court rejected Hernandez's arguments,[9] explaining, "an inmate's petition under section [1172.6] 'express[es] the hypothetical situation' of 'what would happen today if he or she were tried under the new provisions of the Penal Code?' [Citation.] Once a petitioner establishes a prima facie case of eligibility, the prosecutor must prove under amended sections 188 and 189 the petitioner is ineligible for resentencing '*under current law.*' " (*Hernandez, supra,* 60 Cal.App.5th at p. 110, italics added.) Thus, the court concluded, "[I]f prosecuted today, under current law, Hernandez could be convicted of first degree murder under section 189, subdivision (f). [Citation.] What this court decided in 1990, and whether that decision is law of the case, is not relevant to the analysis." (*Ibid.*)

The same reasoning applies to the instant case. Resentencing under section 1172.6 requires that "[t]he petitioner could not *presently* be convicted of murder or attempted murder because of changes to Section 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (a)(3), italics added.) At the evidentiary hearing under subdivision (d)(3), the prosecution

---

[9] The court also rejected Hernandez's third argument, that the law of the case doctrine precluded conviction today of first degree felony murder. (*Hernandez, supra,* 60 Cal.App.5th at p. 110.)

18

must prove beyond a reasonable doubt the petitioner is guilty of murder under *current* law notwithstanding the amendments to sections 188 and 189.  (*People v. Vargas* (2022) 84 Cal.App.5th 943, 952.)  The trial court thus does not determine guilt, but rather, the petitioner's eligibility for relief under a retroactive sentencing law based on a reasonable doubt standard.  (*Njoku, supra,* 95 Cal.App.5th at p. 45.)

Finally, appellants' ex post facto argument amounts to nothing more than a "heads I win, tails you lose" proposition.  There is no dispute that appellants were validly convicted in 1992 under the law as it stood in 1992.  There is also no question they can be validly convicted under current law in 2024.  But appellants claim they are entitled to acquittals by applying current law to invalidate the 1992 theory of conviction, while reserving the right to apply 1992 law to avoid upholding their convictions under current law.  There is nothing in the text, legislative history, or stated intent of Senate Bill No. 1437 to support application of section 1172.6 in this manner.

In short, ex post facto principles have no application here.  The superior court properly could and did deny appellants' resentencing petitions on the ground that they could be convicted under current law on a theory of first degree felony murder based on the kidnappings.

## II.  Substantial Evidence Supports the Superior Courts' Findings

### A. *Substantial evidence supports the superior court's determination that appellant Hill intended to kill Thomas and is therefore guilty of attempted murder*

Attempted murder consists of two elements:  the specific intent to kill coupled with a direct but ineffectual act to

accomplish the intended killing. (*People v. Covarrubias* (2016) 1 Cal.5th 838, 890; *People v. Gaines* (2023) 93 Cal.App.5th 91, 131.) Although evidence of motive is not required to establish intent to kill, such evidence is often probative of intent. (*People v. Smith* (2005) 37 Cal.4th 733, 741 (*Smith*).) And "[b]ecause direct evidence of a defendant's intent rarely exists, intent may be inferred from the circumstances of the crime and the defendant's acts." (*People v. Sanchez* (2016) 63 Cal.4th 411, 457.)

Here, substantial evidence supports the superior court's determination that appellant Hill fired at Thomas with the intent to kill him. The evidence established that Hill was a key player in an elaborate plan to obtain $10,000 in ransom money from Thomas's mother without getting caught. Burge, who might have witnessed Thomas's abduction, was also kidnapped for being " 'at the wrong place at the wrong time.' " After Thomas had been taken to the house and handcuffed, Hill came in carrying a gun and said to Thomas, " 'Yeah, we got you.' " Apparently wanting to avoid detection, Hill pointed his gun at both Thomas and Burge, repeatedly telling them to be quiet and warning Burge to "[s]hut up. We're not playing. Keep the noise down."

After the ransom call to Thomas's mother, when Simms and appellant Jenkins left the house, appellant Hill and Doss guarded Thomas and Burge at gunpoint to prevent their escape. Thomas was handcuffed with tape over his mouth. When Simms and Jenkins returned, they falsely told Thomas his mother was not home and the ransom money had not been collected. Still, Hill and his cohorts did not release their captives, and showed no inclination to do so. Indeed, when Simms and Jenkins again left the house, Hill and Doss continued to guard Thomas and Burge at gunpoint.

20

After being held captive at gunpoint for about five hours and believing that he would be killed if he did not escape, Thomas threw himself out a closed window.  Immediately after Thomas jumped out the window, appellant Hill came out of the house with Doss, firing five or six shots at Thomas as they chased him down the street.

All of these circumstances surrounding the kidnappings, which culminated in Hill's act of firing multiple shots at Thomas while actively pursuing him to stop his escape, constitute substantial evidence of Hill's intent to kill Thomas.  Indeed, " '[t]he act of firing toward a victim at a close, but not point-blank, range "in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill." ' " (*Smith, supra,* 37 Cal.4th at p. 741.)  The fact that Hill gave up the chase and stopped shooting at Thomas without succeeding in killing him does not establish that he lacked the intent to kill.  As our Supreme Court has observed, " ' "The fact that the shooter may have fired only once and then abandoned his efforts out of necessity or fear does not compel the conclusion that he lacked the animus to kill in the first instance.  Nor does the fact that the victim may have escaped death because of the shooter's poor marksmanship necessarily establish a less culpable state of mind." ' " (*Ibid.*)

21

**B.** *Substantial evidence supports the superior courts' findings that appellants Hill and Jenkins are guilty of felony murder as major participants in the kidnapping who acted with reckless indifference to human life*

*1. Applying the factors identified in* Banks, supra, *61 Cal.4th 788, substantial evidence supports the superior courts' findings that both appellants Hill and Jenkins were major participants in the kidnappings*

In *Banks*, our Supreme Court identified a number of factors to be considered "in determining the ultimate question, whether the defendant's participation 'in criminal activities known to carry a grave risk of death' [citation] was sufficiently significant to be considered 'major.'" (*Banks, supra,* 61 Cal.4th at p. 803.) Those factors include: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used?" (*Ibid.*) The court emphasized, however, that while all of these factors may be weighed in determining the extent of a defendant's participation in the criminal enterprise that resulted in death, "[n]o one of these considerations is necessary, nor is any one of them necessarily sufficient." (*Ibid.*)

Nearly all of the *Banks* factors support the superior courts' findings that Hill and Jenkins were both major participants in the kidnappings.

There was substantial evidence that both Hill and Jenkins played major roles in planning the kidnapping of Thomas, which led directly to Burge's kidnapping and death. (*Banks, supra,* 61 Cal.4th at p. 803 ["What role did the defendant have in planning the criminal enterprise that led to one or more deaths?"].) The kidnapping required significant planning and coordination: handcuffs and duct tape were at the ready to restrain the victims, the timing of Thomas's abduction had been set, all of the perpetrators had guns, and the cooperation of "Donna" had been arranged to collect the ransom money from Ms. Thomas.

Jenkins was waiting at the back door as Simms walked up to the house holding Thomas at gunpoint. Jenkins then put his gun to Thomas's head as he forced him into the living room where he put Thomas in handcuffs and taped his mouth. As he handcuffed Thomas, Jenkins said, "This is for when I seen you the other day and you pointed your finger at me." It was then Jenkins who went out and returned holding Burge at gunpoint. And as Simms handcuffed, tied and gagged Burge, Jenkins stood with his gun trained on Burge.

Although Hill did not arrive at the house until shortly after Thomas and Burge had been taken captive, he showed no surprise at finding the two men bound and gagged in the living room. Rather, he said to Thomas, "Yeah, we got you."

Hill and Jenkins used lethal weapons throughout the kidnapping, and both men repeatedly threatened Thomas and Burge with their guns. (*Banks, supra,* 61 Cal.4th at p. 803 ["What role did the defendant have in supplying or using lethal

weapons?"].) Jenkins used his gun to force both victims to enter the house against their will. He held his gun against Thomas's head to make him call his mother for the $10,000 ransom. Hill also repeatedly pointed his gun at Thomas and Burge, telling them to "keep the noise down." When Jenkins and Simms left the house, Hill stayed behind to guard the captives at gunpoint, and Hill actually fired his weapon at Thomas after Thomas had thrown himself through a closed window to escape.

The evidence also showed Hill and Jenkins were aware of the dangers posed by the nature of the crime. (*Banks, supra,* 61 Cal.4th at p. 803 ["What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants?"].) Not only were Hill, Jenkins, and the rest of the cohorts armed, but neither Hill nor Jenkins gave any indication that the circumstances surrounding the kidnappings, the restraint of Thomas and Burge, or the close watch over the captives to prevent escape were outside of the scope of their plan. There was no evidence of any reaction by Hill or Jenkins when Simms shot Burge in the foot for complaining and making too much noise. (See *People v. Douglas* (2020) 56 Cal.App.5th 1, 11 ["Missing from Douglas's description of the robbery and murder and its aftermath are signs the shooting surprised him"].) By pressing his gun into Burge's back as he forced him into the house, Jenkins showed a clear awareness of the risk, indeed the likelihood, that this witness to the Thomas kidnapping and robbery would be killed. For his part, Hill did not hesitate to fire on Thomas when he tried to escape.

Evidence that both Jenkins and Hill were in a position to prevent Burge's murder and that their actions played an

24

important role in Burge's death establishes both as major participants. (*Banks, supra,* 61 Cal.4th at p. 803 ["Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death?"].) Jenkins went out and kidnapped Burge because he was " 'at the wrong place at the wrong time,' " having witnessed Thomas's abduction. Jenkins was thus directly responsible for setting the events in motion that led to Burge's death. Jenkins then left his two armed cohorts to guard Thomas and Burge when he left the house, knowing that lethal force might be used. And lethal force was used. After chasing and shooting at Thomas, Hill and Doss were left alone with Burge. Because Burge had a gunshot wound to his foot, the superior court reasonably found that Doss did not take him to the park by himself, but was assisted by Hill. Hill thus had two opportunities to facilitate or prevent Burge's murder, and his actions ultimately played a decisive role in Burge's death.

Finally, Hill did not call for help after lethal force was used. For his part, Jenkins offered Thomas $5,000 to say that he had lied in his preliminary hearing testimony. (*Banks, supra,* 61 Cal.4th at p. 803 ["What did the defendant do after lethal force was used?"].)

*2. Applying the factors identified in* Clark, supra, *63 Cal.4th 522, substantial evidence supports the superior courts' findings that appellants Hill and Jenkins both acted with reckless indifference to human life*

Our Supreme Court has explained that "[r]eckless indifference to human life has a subjective and an objective element. (*Clark, supra,* 63 Cal.4th at p. 617.) As to the

25

subjective element, '[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and he or she must consciously disregard 'the significant risk of death his or her actions create.' (*Banks, supra*, 61 Cal.4th at p. 801; see *Clark*, at p. 617.) As to the objective element, ' "[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation." ' (*Clark*, at p. 617, quoting Model Pen. Code, § 2.02, subd. (2)(c).)" (*In re Scoggins* (2020) 9 Cal.5th 667, 677.)

In *Clark*, our Supreme Court handed down a list of factors to consider in determining whether a defendant acted with reckless indifference to human life: (1) The defendant's use of, or awareness of the presence of a weapon or weapons; (2) The defendant's physical presence at the crime, and the opportunities to limit it and/or to aid the victim(s); (3) The duration of the felony and restraint of the victim(s); (4) The defendant's awareness that an associate is likely to kill; and (5) The defendant's efforts to minimize the risk of violence during the course of the felony. (*Clark, supra,* 63 Cal.4th at pp. 618–623.) As it had in *Banks*, the court emphasized that " '[n]o one of these considerations is necessary, nor is any one of them necessarily sufficient.' " (*Id.* at p. 618, quoting *Banks, supra*, 61 Cal.4th at p. 803.) And "[b]ecause the major participant and reckless indifference elements often ' "significantly overlap" ' [citations], this list of factors also overlap[s] with those . . . identified in connection with the major participation inquiry in *Banks*." (*People v. Strong* (2022) 13 Cal.5th 698, 706.)

Applying those factors to the case at bar, we conclude substantial evidence supports the superior courts' findings that Hill and Jenkins both acted with reckless indifference to human life in carrying out the kidnappings.

Both Hill and Jenkins were present at the scene of the kidnappings, both were armed, and both used their guns repeatedly to intimidate and threaten Thomas and Burge. It is also apparent from the circumstances of the kidnappings that all four perpetrators were involved in the planning of the crime, and neither Hill nor Jenkins attempted to restrain their compatriots or aid the victims in any way. The kidnapping extended over five hours, during which time Thomas and Burge were held at gunpoint, handcuffed, tied up, and had duct tape placed over their mouths. In addition, a T-shirt was stuffed into Burge's mouth, and Simms shot Burge in the foot. Jenkins had numerous opportunities to restrain the other gunmen and/or aid the victims; instead, he robbed Thomas, while Hill stood by. And even when Jenkins left the house, he left armed guards to prevent the captives' escape. After Hill fired his gun at Thomas to stop him from fleeing, he did not help Burge to escape, nor did he call for help at any time before or after Burge's murder.

There was also substantial evidence that Jenkins knew his cohorts might kill Burge. Jenkins personally kidnapped Burge at gunpoint because he happened to be "in the wrong place at the wrong time." When Jenkins left two armed associates to guard Thomas and Burge, Simms had already fired his gun and shot Burge in the foot—providing evidence that Jenkins had contemplated that Hill and Doss might use deadly force.

Jenkins argues that the robbery of Thomas was completed by the time Burge was killed, and there was no evidence Jenkins

27

was present at the scene of the murder.  Our Supreme Court has rejected this argument, "holding that felony murder applies when the killing and the felony are part of one continuous transaction, including a defendant's flight after the felony to a place of temporary safety."  (*People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1146, citing *People v. Cavitt* (2004) 33 Cal.4th 187, 207.)  As the *Cavitt* court explained, "Our reliance on the continuous-transaction doctrine is consistent with the purpose of the felony-murder statute, which 'was adopted for the protection of the community and its residents, not for the benefit of the lawbreaker, and this court has viewed it as obviating the necessity for, rather than requiring, any technical inquiry concerning whether there has been a completion, abandonment, or desistence of the [felony] before the homicide was completed.' "  (*Cavitt,* at p. 207.)

Here, there is no separating the kidnappings from the robbery or the murder:  The robbery of Thomas occurred as part of the kidnapping for ransom, which led to the kidnapping of the witness, Burge, to avoid detection.  It was reasonable to infer that the murder of Burge was motivated by the same impulse:  To eliminate a witness to the original crimes.  And by the time Burge was killed, none of the perpetrators had reached a place of temporary safety following the robbery or the kidnappings.  Thus, even if the robbery could be said to have been completed before the murder, the kidnapping continued, for "[a] kidnapping 'continues until . . . the kidnapper releases or otherwise disposes of the victim and has reached a place of temporary safety.' "  (*People v. Ramirez* (2022) 13 Cal.5th 997, 1121, quoting *People v. Barnett* (1998) 17 Cal.4th 1044, 1159.)

In sum, applying the factors identified in *Banks* and *Clark* to determine if a defendant was a major participant in the felony who acted with reckless indifference to human life, we conclude substantial evidence supports the superior courts' findings that appellants Hill and Jenkins are guilty of felony murder based on kidnapping. Accordingly, they are therefore ineligible for relief under section 1172.6.

## DISPOSITION

The orders denying appellant Hill's and appellant Jenkins's petitions for resentencing under Penal Code section 1172.6 are affirmed.

CERTIFIED FOR PUBLICATION.

LUI, P. J.

We concur:

CHAVEZ, J.

HOFFSTADT, J.